**PHILADELPHIA ELECTRIC COMPANY**

**v.**

**CURTIS BAY TOWING COMPANY OF PENNSYLVANIA and TUGBOAT J. H. DEINLEIN**

**v.**

**UNITED STATES of America and American Dredging Company.**

**Margaret C. WALLING, Ritner E. Walling and Richard C. Walling, co-partners trading as Oliver Transportation Company,**

**v.**

**CURTIS BAY TOWING COMPANY OF PENNSYLVANIA and Tugboat J. H. Deinlein**

**v.**

**UNITED STATES of America and American Dredging Company.**

**Nos. 41, 43 of 1961.**

United States District Court
E. D. Pennsylvania.

Oct. 13, 1966.

James B. Doak, of LaBrum & Doak, Philadelphia, Pa., for libellants.

Richard W. Palmer, of Rawle & Henderson, Philadelphia, Pa., for Curtis Bay Towing Co.

James F. Young, of Krusen, Evans & Byrne, Philadelphia, Pa., for American Dredging Co.

Drew J. T. O'Keefe, U. S. Atty., and Sullivan Cistone, Asst. U. S. Atty. and Thomas F. McGovern, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for the United States.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BODY, District Judge.

This consolidated suit, in Admiralty, involves claims for damage to the Barge ELECTRIC #20 and the loss of part of its cargo of coal as a result of a stranding in the vicinity of Windy Point (Greenwich) Coal Pier on December 22, 1959, while in the tow of the tug J. H. DEINLEIN, operated by Curtis Bay Towing Company of Pennsylvania.

Two libels were filed against Curtis Bay by Philadelphia Electric Company (owner of the coal) and Oliver Transportation Company (owner of ELECTRIC #20) for their alleged damage.

Curtis Bay impleaded the United States of America and three dredging companies—American Dredging Company, The Arundel Corporation, and Great Lakes Dredge and Dock Company. At a pretrial conference in this matter, The Arundel Corporation and Great Lakes Dredge and Dock Company were dismissed from the suit.

The two actions were consolidated for a trial which was held before me without a jury from December 6, 1965 to January 27, 1966. Counsel for the respective parties submitted extensive requests for Findings of Fact and Conclusions of Law.

Having reviewed those proposals, the Court now enters the following Findings of Fact and Conclusions of Law. Any requested Findings and Conclusions which are inconsistent with those enumerated, infra, are considered rejected.

## FINDINGS OF FACT

1. Philadelphia Electric Company ("Philadelphia Electric"), libellant in No. 41 of 1961, was at all times material hereto an electric utility corporation engaged in the manufacture and sale of electricity, which operated power plants in Philadelphia and Chester, Pennsylvania, in which coal was used for fuel.

2. Libellants in No. 43 of 1961, Margaret C. Walling, Ritner E. Walling and Richard C. Walling, co-partners trading as Oliver Transportation Company ("Walling"), were at all times material hereto engaged in the business of operating barges for the transportation of coal between points on the Delaware River, particularly the Windy Point coal pier in Philadelphia and Chester, Pennsylvania.

3. Curtis Bay Towing Company of Pennsylvania, Inc. ("Curtis Bay"), the claimant-respondent in Nos. 41 and 43 of 1961, is a corporation having its principal place of business in Philadelphia, Pennsylvania. At all times material hereto Curtis Bay operated a fleet of tugboats, including the J. H. DEINLEIN, under bareboat charter, providing towing services between various ports and other places on the Delaware River, including

Windy Point coal pier, Philadelphia, and Chester, Pennsylvania.

4. The United States of America ("Government"), impleaded respondent in Nos. 41 and 43 of 1961, is a sovereign which has, by the Suits in Admiralty Act, consented to be sued in the instant action. The Government was impleaded for alleged failure to maintain Buoy 39 on its charted position in the Delaware River below the Windy Point coal pier over a period of approximately one year and for the alleged failure to replace it on station after notice on four separate occasions in 1959 prior to December 22, 1959, the date of stranding.

5. American Dredging Company ("American Dredging"), impleaded respondent in Nos. 41 and 43 of 1961, is a Pennsylvania corporation having its principal place of business in Philadelphia, Pennsylvania, and was engaged in dredging and in the operation of derricks and salvage equipment at all times material hereto. From February 1959 to March 1960 it was, pursuant to a contract with the United States Army Engineers and a dumping permit, engaged in dumping dredged rock in an area extending from the Pennsylvania shore of the Delaware River below the Windy Point coal pier off the Philadelphia Naval Base to a line in the river, west and outside of the channel of the river. American Dredging was impleaded for alleged dumping of rock within the limits of the river channel in violation of the United States Army Engineer's permit and because said rock allegedly created an unlawful obstruction to navigation.

6. On December 22, 1959, Walling owned the steel hull, rectangular shaped, raked end Barge ELECTRIC #20, 170 feet long, 40 feet wide, with a midships depth of 17 feet, and, because of elevation of the deck ends, a depth of 18 feet 6 inches at either end. The barge, which had a single cargo hold of 2600 tons capacity, was without propulsion or steering and was manned by a bargee who tended its lines and checked its condition. The bargee, who was employed by Wall-ing, lived in a house on the stern of the barge.

7. The steel hull tug J. H. DEIN-LEIN (146 gross, 99 net tons) is 81.1 feet in length, 24 feet in beam, with a depth of 9.8 feet, and powered by a 700 h. p. diesel engine. It had a magnetic compass in its wheelhouse and a compass card giving the compass error on different headings.

8. On the morning of December 22, 1959 the Barge ELECTRIC #20, having approximately 30 tons of bituminous coal on board, was additionally loaded with 2381 tons of coal owned by Philadelphia Electric. This loading process took place at the coal dumper on the upriver side of the Windy Point coal pier, located on the Pennsylvania side of the Delaware River just above the Philadelphia Naval Base and approximately at the upper end of the East Horseshoe Range.

9. Upon completion of the loading of the coal, the Barge ELECTRIC #20 was properly trimmed, with a slight drag to stern, and in all respects seaworthy.

10. On December 22, 1959, Curtis Bay, for pursuant to an arrangement with Walling to tow Walling's barges, assigned the tug J. H. DEINLEIN ("DEINLEIN") to tow the Barge ELECTRIC #20 from Windy Point coal pier to Chester, Pennsylvania. Thus tug, with Curtis Bay relief captain Vincent Kelly ("Kelly") in charge, arrived at the Windy Point coal pier at about 10:05 A.M. on December 22, 1959 and tied up nearby to await the completion of the loading.

11. When the barge was loaded, the DEINLEIN, pursuant to radio-telephone orders from Curtis Bay's dispatcher, made fast to the starboard quarter of the barge. Kelly secured the barge to the tug with three heavy manila lines which were stretched taut before the towing got under way and which required no further adjustment.

12. The draft of the barge was between 16½ and 17 feet. Kelly did not know the draft of the barge at the com-

mencement of the tow. This draft could have been ascertained by subtracting the freeboard from the barge's depth. However, Kelly admitted he did not know the depth of the barge and therefore would have had no definite figure from which to subtract the freeboard in order to arrive at an accurate draft. On cross-examination Kelly testified that he was figuring on between 15 and 16 feet of draft for purposes of navigation.

13. Captain Kelly, an experienced navigator on the Delaware River, held a first-class pilot's license issued by the U. S. Coast Guard for the Delaware River and Bay, and has served on tugs on that river since 1950. Kelly had towed loaded coal barges from Windy Point to Chester about fifty times per year since 1955. It was customary to tow the coal barges on an ebb tide and certain contract rates were prescribed for such towage. In particular, he had towed the loaded Barge ELECTRIC #20 to Chester six times in the six months prior to December 22, 1959, the last previous trip occurring on November 26, 1959. These six trips had begun earlier in the ebb tide when there was more water over the Horseshoe Shoal than was present at 12:12 P.M. on December 22, 1959.

14. At 12:00 o'clock noon on December 22, 1959 Kelly, having secured the ELECTRIC #20 to the tugs portside, maneuvered the barge around in the slip between the coal pier and the Pennsylvania Railroad's ore pier, so that the bow of the barge was pointing out toward the river. The tug and tow, with Kelly steering and in control, then proceeded out the center of the slip between the coal and ore piers. When the flotilla reached the river end of the coal pier, Kelly did not proceed on a straight line out to the channel, but turned downstream while still outside the channel and steadied the tug and tow on a course heading approximately south. Kelly testified that he steadied on a course which would clear Buoy 39 on which he was relying, by about 100 feet.

15. Two fixed range lights were maintained by the United States Coast Guard on the New Jersey side of the river at the river end of the East Horseshoe Range. These lights were in structures known as markers, which were visible during the day, one in back of the other. The front light was lower than the rear light, and when a navigator bound down the river lined up the lights for the markers ahead of him he was on the ranges, the downbound course of which is 206° true, or 215° magnetic.

16. The channel of the river in the East Horseshoe Range is 1000 feet wide, with a project depth of 40 feet. The channel and its limits are established by the Corps of Engineers, United States Army. The personnel of this agency of the United States make quarterly soundings surveys to determine whether the project depth is being maintained and to prepare specifications for dredging.

17. The United States Coast Guard maintained a lighted flashing green buoy, known as buoy 39, in a charted position near the west edge of the river channel East Horseshoe Range. The charted position of this buoy was approximately 498 feet in a straight line distance from the downriver outboard end of the Windy Point coal pier. According to the Coast Guard, the purpose in maintaining this buoy at the upriver end of the Horseshoe Shoal was to make the shoal, which has existed in this area for many years. This buoy was not listed as a channel buoy in the Light List. However, Captain Kelly testified that it was commonly thought to mark both the shoal and the channel.

18. As the flotilla arrived at the end of the coal pier, there was no traffic coming either down or up the river, and the tug was not required to maneuver with respect to any traffic. The starboard side of the tug was estimated by the bargee, Mr. Andrade, to be 25 to 35 feet off the river end of the coal pier as the tug and her tow turned downstream. Kelly did not offer his estimate of this same distance to refute Andrade's figure.

19. At all times material the weather was clear and visibility unlimited. The wind was blowing from a northeasterly

direction at approximately ten miles per hour and did not influence navigation. The tide was ebbing; low water in the river off Windy Point occurred at 12:59 P.M. on December 22, 1959, and was .5 feet below mean low water. The current in the river set downstream in the general direction of the channel.

20. At the time the flotilla started down the river bound for Chester, the level of the water in the river in the vicinity of Windy Point was two feet lower than it had been at 10:00 A.M., the original starting time for the trip to Chester. The tug captain knew this. The state of the tide and the height of the water were readily observable by reference to water marks on the side of the piers, and at Greenwich there was a tide gauge.

21. After Kelly had turned the tug and tow downriver and steadied them on a course which was roughly south, he continued on that course until the barge grounded at approximately 12:20 P.M. Kelly testified that he did not make use of the tug's magnetic compass because the visibility was excellent and the compass would, in any event, have been affected by the magnetism caused by the presence of the barge alongside. He further testified that he was steering by various aids to navigation and familiar landmarks, which he had great difficulty in describing with any particularity.

22. The tug captain reported to the Curtis Bay dispatcher shortly after the grounding that the barge was ashore 300 feet below the coal pier on the Pennsylvania side of the river, 75 feet off Buoy 39 towards the ship channel.

23. When the barge grounded, its hull dug an indentation or furrow in the mud below the surface of the mud bottom of the river. At the bow of the barge extending up from its bottom there was an accumulation or pile of mud with rocks in it approximately two feet above the level of the surrounding bottom. The barge was hard aground on a mud bottom containing rocks.

24. The barge did not, so far as could be ascertained, move at all from the position in which it was grounded, despite the pushing, pulling and twisting of one, two and then three tugs of Curtis Bay which endeavored to move it from the strand toward the channel of the river. A short time after the unsuccessful efforts of the tugs to free the barge, the bargee found that the barge was leaking and notified the tug captain.

25. After the barge was freed from the strand and placed in the shipyard, it was found that one of the bottom plates at the turn of the bow rake had been holed by a rock and numerous bottom plates were scored, set in and indented from contact with mud and rocks from the river bottom.

26. The diver who examined the barge and the bottom of the river around the edge of the barge on December 27, 1959 found a mud bottom containing rocks. He did not locate a pile of rock.

27. As a result of the pushing of the steel bows of the tugs against the barge, damage to stanchions, pipes, coaming, brackets and other parts of the barge was sustained.

28. The Barge ELECTRIC #20 did not ground on an uncharted obstruction in the channel of the river, but outside and to the west of the channel on the eastern portion of the well known Horseshoe Shoal, which has existed in this location for many years.

29. Kelly knew that the depth of water was so limited to the west of the channel below the Windy Point coal pier that if he ran out of the channel he would run out of water. Nevertheless, he turned close to the river end of the coal pier and proceeded downstream at an angle outside of and toward the channel on a route by which the tug and tow would pass over the easternmost portion of Horseshoe Shoal before reaching the channel.

30. The position of the grounded barge was established by libellants' witness Lord, a registered surveyor, by

using a surveyor's transit set up on the Windy Point coal pier. He found the midline of the stern of the barge to be 663 feet below the downriver end of the coal pier and 131 feet east of the river face of the coal pier. A plot of this position on the U. S. Army Corps of Engineers' River Channel Survey Charts shows this point to be 110 feet west of the west line of the river channel.

31. The position of the grounded barge was also determined by the use of sextants by respondents' witness Gustin, by a Corps of Engineers Survey Team and by an engineer employed by American Dredging. The plots of the positions they determined were to the west of the river channel and in substantially the same position plotted by libellants' witness.

32. On December 22, 1959, at the time the tug and tow started down the river, Buoy 39 was not in its charted position, but was west of its charted position toward the Pennsylvania shore. Kelly took no bearing on or observations of the buoy before the grounding. His local knowledge as a pilot should have told him that the buoy was out of position. He was able to determine this fact after the grounding. He could have done so before the grounding had he exercised the care and skill of a reasonably prudent navigator.

33. Buoy 39 was found, on the afternoon of December 24, 1959, to be 225 feet, 298° true from its charted position. This position was so far removed from its charted position that a pilot having the local knowledge required of a licensed river pilot would have been aware of this displacement.

34. The tug captain would not testify with any particularity or definiteness as to the course on which he steadied up after coming out of the slip at the coal pier, or the objects on or by which he was steering or relating the heading of the tug and tow, or any bearings or observations made after the grounding. His account of his navigation is not credible and indicates a lack of knowledge as to where his tug and tow were with respect to the Horseshoe Shoal and indicates lack of the due care and skill required of a reasonably prudent navigator.

35. The navigation of the tug and tow on an angular course outside the channel and over the eastern portion of the Horseshoe Shoal in order to reach the river channel downstream from the Windy Point coal pier was not that of a navigator exercising reasonable prudence and skill.

36. The tug captain's navigation outside the channel of the river imposed on respondents the burden of establishing that the grounding of the barge was nonnegligent. They failed to carry the burden of explanation.

37. The fact that Buoy 39 was obviously out of position at the time of the grounding did not cause or contribute to the grounding. A reasonably prudent and skilled pilot would not have relied on it.

38. Respondents did not establish that the grounding of the barge outside the channel was due to a cause or reason that would exculpate them from liability for its grounding.

39. The navigation of the tug captain, a licensed pilot, was negligent.

40. There is no evidence that the U. S. Army Engineers brought to the attention of the U. S. Coast Guard, prior to the stranding on December 22, 1959, the fact that Buoy 39 was out of position.

41. The fact that at the time of the grounding the west line of the channel of the Delaware River East Horseshoe Range, as shown on U. S. Coast and Geodetic Chart No. 280, was to the west of the west line of the channel as shown on the Channel Examination Survey of the river, published by the Army Engineers, was not causative of the grounding.

42. The Barge ELECTRIC #20 grounded to the west of the Delaware River channel as it was indicated on the U. S. Coast and Geodetic Survey Chart No. 280, and to the west of the channel shown on the Army Engineers Channel Examination Survey Sheet.

43. No fault or negligence on the part of the United States of America caused or contributed to the stranding.

44. Respondents produced no credible evidence which established that American Dredging dumped any rock outside the dumping area off the Naval Base for which it held a permit from the United States Army Engineers.

45. There is no evidence that the rock pile described and plotted on December 1, 1962 by respondents' diver Stith was in that location on December 22, 1959, or that it was the object on which the Barge ELECTRIC #20 grounded on December 22, 1959. The evidence is to the contrary.

46. No evidence was produced of any negligence of American Dredging which caused or contributed to the stranding of the Barge ELECTRIC #20 on December 22, 1959.

47. The parties have stipulated that the amount of the damages sustained by Walling as a result of the stranding of their barge was $52,526.69, and that the amount of the damages sustained by Philadelphia Electric was $16,447.25. Included in the damages was a general expense item of $2,495.00 for charges of Curtis Bay for tug services in standing by the stranded barge after the grounding. Curtis Bay has not been paid for these services, and is entitled to a reduction of the damages in the amount of these charges. Since the general average expenses were pro-rated 56.58% to Walling and 43.42% to Philadelphia Electric, the damages of Walling will be reduced by $1,411.67 (56.58% of Curtis Bay's unpaid charges), to the sum of $51,115.02, and the damages of Philadelphia Electric will be reduced by $1,083.33 (43.42% of the Curtis Bay service charges), to the sum of $15,363.92.

## CONCLUSIONS OF LAW

1. These cases are within the admiralty and maritime jurisdiction of this Court.

2. Respondent, Curtis Bay, was obliged to have the navigation of its tug in charge of a pilot who had knowledge of the location, courses, depth and limits of the channel of the Delaware River, and the location, nature of the river bottom outside the channel and the controlling depth of the water over obstructions and to have its pilot exercise the care and skill of a reasonably prudent navigator.

3. Respondents' tug captain failed to exercise the care and skill of a reasonably prudent navigator and was negligent in navigating the tug and barge outside the channel in an area of known shoal water.

4. The captain of the DEINLEIN was negligent in testing a known danger and assumed the risk involved in towing the barge outside the channel and in an area with respect to which he knew or should have known by his local knowledge as a pilot that there was insufficient water to safely tow the Barge ELECTRIC #20 at the then stage of the tide.

5. Respondents have not shown that they exercised due care in the towing of the Barge ELECTRIC #20 and have not produced any evidence which would excuse the presence of the tug and barge outside the channel of the river in an area where there was not sufficient water to navigate the barge at the then stage of the tide.

6. It was the duty of the tug captain, who knew the channel of the river by courses and by the fixed ranges, to know or determine whether or not Buoy 39 was out of position on December 22, 1959 before placing reliance on it, and his failure to do so was negligence: The Somers N. Smith, 120 F.Rptr. 569 (D.C.Me.1903); The Miles Standish, 1928 A.M.C. 215 (D.C., S.D.N.Y.); The Hercules, 81 F. 218 (N.D.Cal.1897).

7. The fact that Kelly ran the barge upon the well known Horseshoe Shoal in clear weather with good visibility is evidence of his negligence under the circumstances: The Deer, Fed.Cas. p. 3737 (S.D.N.Y.1870); The Somers N. Smith, supra; Brown & Root v. American Home Assurance, 353 F.2d 113 (5 Cir.) 1965 A.M.C. 2689, 2693.

8. The decision of the tug captain to go over the route he followed outside the channel to reach the channel at near low water was unjustified and indicated a lack of care and skill. The testing of a known danger was inconsistent with reasonably prudent piloting and navigation.

9. In towing the Barge ELECTRIC #20, Curtis Bay and its tug captain did not exercise the due care and skill required of a prudent navigator in the performance of towing services, and Curtis Bay and its tug are, therefore, liable to the owner of the said barge and to the owner of the coal thereon for the damage sustained by them as a result of grounding.

10. Each of the libellants is entitled to judgment and a decree against Curtis Bay and the DEINLEIN for damages in the amounts set out in Finding of Fact No. 47, with interest at the rate of 6% from the date of payment of the respective items of damage by libellants until the payment thereof by the respondents, and libellants shall submit appropriate decrees.

11. No negligence or fault of either the United States of America or of American Dredging Company causing or contributing to the stranding has been shown, and each of them is entitled to a decree in its favor as respects the libellants and respondents.

12. Libellants and impleaded respondents are entitled to recover their costs from respondents, Curtis Bay and the DEINLEIN. Counsel for libellants and impleaded respondents may file with the Court a verified petition setting forth the aforementioned costs.

## DISCUSSION

In light of the extensive Findings of Fact and Conclusions of Law, supra, which relate in great detail the circumstances surrounding this barge grounding, the following discussion will be limited to a review of certain facets of the case which the Court considers necessary to comment upon.

## A. KELLY'S RELIANCE ON BUOY 39

Captain Kelly's first mistake on December 22, 1959 was his unwarranted reliance on Buoy 39 as he proceeded out of the slip and turned too sharply downriver off the end of Windy Point coal pier. In Finding of Fact No. 32 we concluded that this buoy was so far removed from its charted position that Kelly, an experienced tug pilot on the Delaware River, should have noticed the displacement and consequently should not have relied on it as an accurate aid to navigation. Even a cursory sighting with the naked eye would have forewarned him that a passage by the flotilla past Buoy 39 of 100 feet was unsafe considering its gross displacement inshore.

We think it not too heavy a burden for Kelly to have visually checked the position of the buoy before he commenced his tow. As a customary practice local pilots such as Kelly could choose two fixed objects—one on the New Jersey shore, the other on the Windy Point coal pier—in such a manner that when Buoy 39 is set on its charted position it would fall precisely in line with those two stationary points. When the buoy, which is so important an aid to navigation in that area, drifts off station one could easily observe such displacement by again sighting from one fixed object to the other and seeing at a glance that the buoy is either inshore or channelward of its charted position. This is possible even when one considers the wide expanse of water surrounding Buoy 39.

With respect to said observance of a buoy, Curtis Bay desires the best of two possible worlds. In its trial memorandum, Curtis Bay states that both Buoy 39 and 37 were off station sufficiently to be misleading to the navigation of the DEINLEIN but not so far off position as to put Kelly on notice that something was wrong with their position. We disagree.

Furthermore, Curtis Bay places much emphasis on the fact that Coast Guard officers Edward Askew and Sherwood Patrick testified that they would have

difficulty, without the aid of instruments, in determining if Buoy 39, for instance, was either inshore or channelward of its charted position. They contend, therefore, that Captain Kelly should be held to no higher standard than these two experts. Curtis Bay's use of these witnesses' testimony is misleading, however. Both Askew and Patrick, in offering their opinions, were clearly testifying that as they came across river from the Gloucester, New Jersey base to the Pennsylvania side they could tell, by visual sightings, whether Buoy 39 was up or down river but could not tell whether it was inshore or channelward. Such testimony certainly does not help Curtis Bay's case. What is obviously important is the vantage point from which such a visual sighting is made. Patrick did opine that from Windy Point coal pier he could determine by naked eye if Buoy 39 was off station either inshore or channelward. (R. 2991–94)

We note, in conclusion, that after the accident Kelly was able to determine that Buoy 39 was out of position. (R. 1838–39)

## B. THE SITE OF THE GROUNDING

We have concluded that Kelly, relying on Buoy 39 and without knowledge of the barge's loaded draft, proceeded on an angle thereby taking a short cut to the channel on an ebbing tide and grounded on the easternmost edge of Horsehoe Shoal, a known obstruction. Those findings are premised on the best and most credible evidence presented at trial.

A careful review of all the exhibits which are relevant to the site of the stranding shows the extreme difficulty in pinpointing the exact location of the grounding *after the fact*. However, taking all of the plottings most favorable to Curtis Bay, we are convinced that the barge was proceeding toward the channel when it hung up. It was *attempting* to reach the channel but failed to do so.

The most that can be said in favor of the tug owner's position is that the port bow corner of the barge is shown to be slightly across the west channel line as reflected on U. S. Coast & Geodetic Survey Chart 280. The barge, therefore, cannot be considered to have been proceeding "in" the channel but merely trying to reach the channel line, which it never did.

Since the barge unmistakably grounded outside the channel, the burden was on Curtis Bay to show that the grounding was non-negligent. Curtis Bay simply failed to carry that burden.

## C. THE TESTIMONY OF DIVER STITH

During the trial I permitted Mr. David Stith, an expert witness produced by respondent, to testify, over the objection of American Dredging Company, with regard to a pile of rock which he apparently located on the river bottom near the site of the grounding. (R. 359–60) Since Mr. Stith's underwater explorations were undertaken some three years after the accident, I conditioned the admission of that evidence on the ability of Curtis Bay to "connect up" the evidence by demonstrating that the condition of the river bottom at that point had remained unchanged from the date of the stranding until Stith's dives began.

Since Curtis Bay failed to show that conditions had remained unchanged, I cannot consider such evidence. The reason for this conclusion is obvious. Unless it could be shown that the river bottom remained the same, the evidence pertaining to the rock pile was not worthy of consideration because those rocks might have been dumped there a year, a month, or perhaps even one day before Stith's first dive.

## D. THE LIABILITY OF THE UNITED STATES

Curtis Bay's case against the Government stands or falls on the theory of imputing knowledge from one governmental agency (U. S. Army Engineers) to another (U. S. Coast Guard). It is undisputed that the Coast Guard did not receive actual notice that Buoys 39 and

37 were off station until the day of the stranding. Consequently, any claim based on actual knowledge must be rejected.

■ This leaves Curtis Bay with the theory that the knowledge of the Engineers, who found the buoys displaced, can be imputed to the Coast Guard. Such a claim of constructive knowledge cannot be maintained against the United States. United States v. Cooper, 200 F.2d 954, 956 (6th Cir. 1953); Indian Towing v. United States, 182 F.Supp. 264, 270 (E. D.La.1959), affd., 276 F.2d 300 (5th Cir. 1960), cert. den., 364 U.S. 821, 81 S.Ct. 56, 5 L.Ed.2d 51 (1960); United States v. Accardo, 113 F.Supp. 783, 785 (D.N.J. 1952), affd. on op. below, 208 F.2d 632 (3rd Cir. 1953).

## ORDER

AND NOW, this thirteenth day of October, 1966, in accordance with the foregoing Findings of Fact and Conclusions of Law, IT IS ORDERED that judgment be and the same is entered in favor of libellant, Oliver Transportation Company, in the amount of $51,115.02 plus interest and in favor of libellant, Philadelphia Electric Company, in the amount of $15,-363.82 plus interest. The aforesaid judgments are hereby entered against the respondent, Curtis Bay Towing Company of Pennsylvania and Tugboat J. H. DEINLEIN.

Pursuant to Conclusion of Law No. 10, libellant may, within thirty days of the date hereof, file a verified petition containing calculations of interest with respect to the various items of damage sustained.

It is further ordered that in the third-party action judgment be and the same is entered in favor of both impleaded respondents, United States of America and American Dredging Company, and against Curtis Bay Towing Company of Pennsylvania and Tugboat J. H. DEINLEIN.

Finally, it is ordered that, pursuant to Conclusion of Law No. 12, libellants and impleaded respondents may, within thirty days of the date hereof, file with the Court a verified petition setting forth their costs, which are hereby assessed against respondent, Curtis Bay Towing Company of Pennsylvania and Tugboat J. H. DEINLEIN.