William B. DIBBLE and Nancy D. Dibble, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 66 C 918.

United States District Court
N. D. Illinois, E. D.

April 4, 1968.

Stuart B. Bradley, John W. McMurray, of Bradley, Eaton, Jackman & McGovern, Chicago, Ill., for plaintiffs.

H. M. Katz, Atty., Dept. of Justice, Washington, D.C., and Thomas A. Foran, U. S. Atty., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUSTIN, District Judge.

On June 13, 1964, William Dibble was attempting to enter the harbor at Great Lakes Naval Training Station in his boat when he collided with the breakwater protecting the harbor. He and his wife, the only other person in the boat at the time, instituted this suit against the Government, claiming that one of the navigation lights in the harbor was negligently maintained and that its improper operation caused the accident. The Government's counterclaim for $943.00 worth of hospital services was dismissed.

The breakwater was built in 1923 after the Army Corps of Engineers issued what is purportedly a permit for the Secretary of War to build the breakwater. The "permit" requires the Secre-

tary to establish and maintain navigation lights if so directed by the Bureau of Lighthouses, now part of the Coast Guard. Lights were installed and the Coast Guard assumed the responsibility of maintaining them. There are three pairs of navigation lights: a pair of flashing lights on the entrance to the breakwater, a pair of flashing lights on a pier structure in the harbor, and a pair of green range lights on shore.

Both pairs of flashing lights are of the same color: a red one on the right on entering the harbor and a white one on the left. There are, however, significant differences between the breakwater and pier lights. The breakwater lights flash once every 4 seconds and are 45 feet above the water. The pier lights flash once every 2.5 seconds and are 15 feet above the water. The breakwater lights are further south and are 1600 feet further into the lake than the pier lights.

The range lights are the most important navigation lights in the harbor. A yachtsman entering the harbor can determine if he is on a safe course merely by looking for the range lights. If he sees the front one directly below the rear one, he knows his boat will pass safely through the breakwater entrance. Range lights such as these mark highways through dangerous waters and, as one expert stated, are a blessing to the boat operator.

The breakwater itself is composed of three arms: the north and south arms extend away from shore for a distance of 1600 feet; the east arm runs parallel to shore in a north-south direction and is connected to the north arm. The entrance is at the southeast corner of the harbor between the east and south arms of the breakwater.

The Dibbles' ill-fated voyage commenced at about 1:00 P.M. at Monroe Street Harbor in Chicago. There they met four guests and the group boarded Dibble's boat, a 30-foot cabin cruiser. The plan was to go north from Chicago, making a few stops, to have dinner at Waukegan and, finally, to leave the boat

at Great Lakes where Dibble had mooring privileges. One of the guests, apparently a yachtsman of some experience, had been invited for the admitted purpose of assisting Dibble in boat handling and advising him of the nature of harbors with which Dibble was unfamiliar.

After a few drinks at Monroe Street, the group departed Chicago. The first stop was Wilmette Harbor where the group had a few more drinks. There was a brief stop at Great Lakes late in the afternoon and then the Dibbles and their guests went to Waukegan where they had a drink or two in the Yacht Club. They went to Mathon's Restaurant, had a drink, and ordered dinner. Then, the group activities came to an abrupt end. There was some sort of disagreement and the Dibbles' yachtsman guest left without eating as did the Dibbles shortly thereafter. Only the three remaining guests stayed to eat.

It was a clear, dark night. Dibble navigated out of Waukegan Harbor and headed due south on a course of 180 degrees. He was about a mile and a half from shore. He saw the lights of the Naval Station on his right and one pair of flashing red and white navigation lights. He came due west to a course of 270 degrees and headed towards the pair of lights. He was travelling at a speed of about 15 miles per hour when he collided with the east arm of the breakwater. The point of impact was about 900 feet north of the red flashing breakwater light.

Plaintiffs have attempted to prove that the white breakwater light was burning steadily and not flashing at the time of the accident. There is no direct evidence supporting this contention. On occasion, between March and June, the light did burn steadily. On three of these occasions the light was repaired by the Coast Guard and apparently operated properly for some time. On a few other occasions, the condition would correct itself. On the night of the accident, the light was seen burning steadily by one witness at sunset and by another

at about 11:30 P.M. The accident occurred at about 9:30 P.M. The light was seen operating properly by the Coast Guard station at Waukegan shortly after midnight. It is important to note that all witnesses state that the malfunction of the light was a readily noticeable condition. There were several people in the area between sunset and 11:30 P.M. that day and no one noticed the light malfunctioning at any other time.

Plaintiffs also claim that the Government was negligent in maintaining the light. The only evidence as to maintenance of the light is that the Coast Guard personnel charged with such responsibility came down from Waukegan and effectively repaired the light within a reasonable time after every report of its malfunction.

Plaintiffs claim that the steady burning of the white breakwater light would mislead a navigator into heading towards the flashing pier lights, thereby causing a collision with the breakwater. However, there was much expert testimony to the contrary. Plaintiffs' own expert stated that on a safe approach to the harbor a boat operator should be able to see all six navigation lights and that if he doesn't he should stop immediately. Other experts emphasized the importance of the range lights and that prudence would require a navigator to make no approach to the harbor until he could see the range lights and had them lined up properly. Experts also testified that a prudent navigator, even on the darkest night, should know the location of charted obstructions and should be able to avoid them.

### Findings of Fact

1. I find that the United States Coast Guard had undertaken to maintain the Great Lakes navigation lights.

2. I find that the procedures established by the Coast Guard for maintaining such lights were reasonable. It was reasonable to assign the Coast Guard station at Waukegan with the responsibility of checking the lights periodically and of repairing them when necessary. The Coast Guard was not required to post a repairman at the lights.

3. I find that a steady burning of the white breakwater light was a condition readily noticeable to anyone in the harbor. I find that no one in the harbor on the night of the accident noticed anything abnormal about the light within two hours before or two hours after the accident.

4. I find that the Coast Guard acted properly and with reasonable care in maintaining the navigation lights. When the lights malfunctioned they were repaired in a reasonable time. This is all that can be required.

5. I find that William Dibble did not exercise proper care in preparing himself for the ill-fated voyage. Since Dibble knew well beforehand that he would be entering a strange harbor at night, he should have become thoroughly familiar with the characteristics of the harbor, the location of the breakwater, the identifying features of the lights. He should have learned the safest possible course headings. I find that he did none of these things.

6. I find that Dibble, his wife and four guests departed Chicago in Dibble's boat on the afternoon of June 13, 1964. They made stops at Wilmette, Great Lakes and Waukegan. I find that there was considerable consumption of alcoholic beverages by all members of the group. Dibble had at least five drinks that day, the last one not more than an hour before the accident. I cannot believe that this activity had no effect on Dibble's perception and judgment. I find that Dibble's lack of temperance, when he knew of the difficult voyage ahead, was imprudent.

7. I find that the Dibbles departed Waukegan alone in their boat that night. I find that Dibble turned south and then west when he saw the lights of the Naval Station. I find that he headed his boat directly towards one pair of red and white flashing lights and that he collided with the breakwater at about 9:30 P.M.

8. There are six navigation lights in the harbor: a set of flashing lights at the breakwater entrance, a set of similar flashing lights on a pier structure in the harbor and two green range lights on shore. I find that Dibble mistook the pier lights for the breakwater lights. I find that Dibble never saw the breakwater lights even though he collided with the breakwater only 900 feet to the north of the red flashing breakwater light.

9. A prudent boat operator is able to identify the various navigation lights by their flashing characteristics, location and height above the water. I find that Dibble's failure to identify the pier lights was negligent navigation.

10. A prudent boat operator would not have turned his boat towards the harbor until he had seen the range lights, one above the other. Dibble's failure to enter the harbor "on the ranges", his failure to utilize the most reliable aid to navigation, was negligent navigation.

11. I find that a boat operator who enters the harbor on the proper course can see all six navigation lights. Due care requires that a boatman know that he must be able to see six navigation lights on entering the harbor. It was negligent for Dibble to have attempted an approach to the harbor with only two lights in view. He should have stopped and attempted to orient himself. His failure to do so was imprudent.

12. I find that Dibble should have seen the outer breakwater lights and that his failure to notice them, even if the white light was burning steadily, was incredible.

13. I find that Dibble was operating his boat at an excessively high speed under the circumstances.

14. I find that Dibble should have known the approximate location of the breakwater and his distance from shore. I find that Dibble's failure to realize he was near the breakwater before the collision was negligent navigation.

15. I find that the negligence of William Dibble in the numerous respects noted was the sole cause of the collision.

16. I find that no act or omission of Government personnel caused or contributed to the collision.

### Conclusions of Law

1. The Court has jurisdiction under the Suits in Admiralty Act, 46 U. S.C. § 741 et seq., and there is no question of venue.

2. Plaintiffs have the burden of proving that the white breakwater light was burning steadily at the time of the accident, that such malfunctioning was caused by the Government's negligent failure to maintain the light, and that such negligence was a contributing cause of the accident. I conclude that plaintiffs have failed to meet such burden as to proving any of the elements of their case.

3. In any event, there is an additional burden on plaintiffs. Since their moving boat collided with a stationary object, there is a presumption of fault against them which can be rebutted only by a showing that they could have taken no reasonable action to have avoided the accident. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Company, 377 F.2d 724 (5th Cir., 1967). I conclude that plaintiffs have failed to rebut such presumption of fault.

4. Based upon considerable expert testimony, including that of plaintiffs' own witness, I conclude that a steadily burning white breakwater light at this harbor could not have misled a prudent boat operator and could not have been a contributing cause of such a collision.

5. I conclude that William Dibble's actions in attempting to enter the harbor on the night of the accident fell far below the requisites of prudent navigation and boat handling. I conclude that Dibble's negligence was the sole cause of the accident.