435 F.2d 213
 AFRAN TRANSPORT COMPANY, as Owner of the STEAMSHIP NORTHERN
GULF, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
BRITISH AMERICAN OIL CO., Ltd., Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant, and S.S.
Northern Gulf andAfran Transport Company,
Claimants-Third Party Defendants-Appellees.
 Nos. 121, 122, Dockets 34302, 34303.
 United States Court of Appeals, Second Circuit.
 Argued Oct. 20, 1970.
Decided Dec. 1, 1970, Rehearing Denied Jan. 18, 1971.
 
 Joseph C. Smith, New York City (Stanley R. Wright and Burlingham, Underwood, Wright, White & Lord, New York City, on the brief), for plaintiff-appellee Afran Transport Co.
 George B. Warburton, New York City (Hill, Rivkins, Warburton, McGowan & Carey, New York City, on the brief), for plaintiff-appellee British American Oil Co., Ltd.
 Ronald R. Glancz, Atty., Dept. of Justice, Washington, D.C. (Robert V. Zener, Atty., William D. Ruckelshaus, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., and Whitney North Seymour, Jr., U.S. Atty., S.D.N.Y., New York City, on the brief), for defendant-appellant.
 Before MEDINA, WATERMAN and FEINBERG, Circuit Judges.
 MEDINA, Circuit Judge:
 
 
 1
 This case arises out of the stranding on November 25, 1963 of the supertanker Northern Gulf on the westerly tip of West Cod Ledge Rock in Casco Bay, approaching the harbor of Portland, Maine. There was considerable damage to the vessel, a good part of her cargo was lost and the Maine shoreline suffered extensive pollution. Judge Tenney's opinion is reported at 309 F.Supp. 650. The underlying cause of the stranding was the displacement of West Cod Ledge Rock Buoy No. 2 a distance of 350 to 400 yards, bearing 097 3/4 degrees from its charted position. The Government does not dispute its fault in failing for a period of some eight months to discover the shifting of the buoy and to restore it to the proper position, and the sole issue before us is whether Judge Tenney correctly held the Government solely at fault, exonerating the pilot and the officers of the vessel.
 
 
 2
 In view of the comprehensiveness of Judge Tenney's excellent opinion we shall condense our statement of the facts of the case, and make it just sufficient to serve as an introduction to the discussion, in the concluding portion of this opinion, of the Government's claim that the failure of the pilot and the ship's officers to ascertain the exact location of the displaced buoy prior to the stranding by utilizing 'bearings from fixed objects and aids to navigation on shore' (Code of Federal Regulations, Title 33, Navigation and Navigable Waters, Section 62.25-55) (1970)[1] constitutes such a statutory fault as to make applicable the drastic rule of The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873). If this rule were applicable the Northern Gulf would be under the burden of proving that the failure to take bearings not only might not or probably did not but that it could not have contributed to the stranding. Judge Tenney rejected this argument and held the vessel bound only to prove that the stranding was caused by the fault of appellant and that there was no contributing negligence on the part of the pilot or the officers of the Northern Gulf. We agree with Judge Tenney and affirm the decree appealed from.
 
 I.
 
 3
 On November 25, 1963 weather conditions in Casco Bay were just about perfect. It was a bright, clear day with almost unlimited visibility. The current was at the last two hours of the ebb tide and neither the current nor the moderate wind from the NW affected navigation. All the many lighthouses and various types of buoys marking the rocks and ledges of this characteristic portion of the coast of Maine were plainly visible. Under these favorable conditions the Northern Gulf, on a voyage from Bandar, Mashur, in the Arabian Gulf, to Portland with a cargo of 261,429 U.S. barrels of crude oil, on a course 276 degrees true brought Portland Lightship abeam 700 yards off her port side. The compulsory state pilot came on board from a pilot boat stationed about 1/2 mile NW of the Lightship; and he took the con on the bridge with a full and proper complement of the vessel's officers.
 
 
 4
 From the bridge of the Northern Gulf, Captain Harlan L. Wadleigh, the pilot, had a complete and quite satisfactory view of the broad expanse of water he was to traverse before closing in on Portland Harbor. The course he intended to take, and the one he often had taken before, in the performance of his customary duties, was to pass between the bell buoy marking Corwin Rock and West Cod Ledge Rock Buoy No. 2, perhaps somewhat favoring the starboard side of this opening to facilitate a gradual turn to starboard to pass West Cod Ledge Rock Buoy No. 2 and get in position for a new course passing the buoys marking Pine Tree Ledge and Jordan Reef to port and Witch Rock to starboard. There was no occasion to take any bearings and by use of what is called his 'seaman's eye' he brought the vessel to a 315 degree true course with Portland Head Light fine on the port bow and West Cod Ledge Rock Buoy No. 2, 15 degrees true on the starboard bow. The vessel remained on this 315 degree course for about 12 minutes and Captain Wadleigh intended to pass about 1/4 mile off West Cod Ledge Rock Buoy No. 2. It is vigorously asserted by the Government that, had bearings been taken and plotted during the progress on this 315 degree course, the pilot would have known that he was proceeding into danger, which, we think, is another way of saying that he would have been alerted to the displacement of the buoy. But Judge Tenney's finding to the contrary is supported by the proofs, including the charts, especially when it is taken into consideration that the displacement of the buoy from its charted position, a mere 350 or 400 yards in a wide expanse of open water, was not to the NE and over the middle shoal of West Cod Ledge but on the bearing 097 3/4 degrees, above mentioned.
 
 
 5
 There was no occasion for taking and plotting any bearings to obtain fixes while the vessel was on the 315 degree course, and had any such bearings been taken and plotted they would have shown that the Northern Gulf was on a safe course.
 
 
 6
 When the West Cod Ledge Rock Buoy No. 2 came off the starboard beam Captain Wadleigh began his turn to starboard. From that time until the vessel fetched up she was on a swing, her forward progress until she steadied up on her new course being something in the neighborhood of 4 knots. Her position was constantly changing and it was manifestly impossible to take a running fix in time to avoid the stranding. Judge Tenney so found and we agree with this finding and all the others set forth in the specific findings and in his opinion.
 
 II.
 
 7
 So we turn to the critical subject of whether the pilot or the officers of the vessel had any reason to suspect that West Cod Ledge Rock Buoy No. 2 was off station. For, in the absence of some suspicious circumstance or notice, navigators are entitled to rely upon the representations made in the Government charts relative to the location of the buoys. See The Clevelander, 83 F.2d 947, 949 (2d Cir. 1936); Trinidad Corp. v. S.S. Sister Katingo, 280 F.Supp. 976, 977 (S.D.N.Y.1967); Chesapeake & O. Ry. v. United States, 1964 A.M.C. 2651, 2654 (E.D.Mich.), amended, 1966 A.M.C. 1883, 1884 (E.D.Mich.1962) (not otherwise reported).
 
 
 8
 It is clear, to begin with, that even the most experienced navigator fully familiar with local conditions could not detect by the use of his eyesight that this displacement of 350 to 400 yards had taken place. There was no point of reference such as existed in some of the cases to which we shall later refer. The reef itself was too far below the surface of the water to disturb the even sequence of the waves or give any other notice of its location.
 
 
 9
 Some lobstermen using their fathometers in connection with the hauling of traps had discovered the displacement of the buoy some eight months prior to the stranding. But the lobstermen had not notified the Coast Guard. Indeed, the constant reading of the Coast Guard publications by Captain Wadleigh, including the daily memoranda issued on Saturdays in the form of mimeographed sheets, and occasional reports by landline phone calls from the Coast Guard base at South Portland, was of no avail as none of the Coast Guard publications or notifications had made any reference to the displacement of this buoy.
 
 
 10
 The explanation given by Captain Wadleigh for his reliance upon the buoy was accepted by Judge Tenney and it appears to us to be in every way satisfactory. The record shows:
 
 
 11
 (1) That the Coast Guard was responsible for the monitoring of the buoys and that it had ample means at its disposal to keep the buoys under close surveillance. Portland Light Vessel should have checked the position of the buoy by a bearing or sextant angle. If it had done so a 3-degree difference would have been revealed between the charted and the actual position of the buoy at the time of the stranding. Cape Elizabeth Life Boat Station was amply manned and appropriate documents specifically listed this particular buoy among others with respect to which the range and bearing were required to be checked at fixed intervals. The buoy tender Cowslip had the primary duty of monitoring this buoy. She passed the buoy on numerous occasions during the eight months period of displacement, 10 times between October 1, 1963 and the date of the stranding. The Coast Guard cutters Acushnet, Barattaria, Coos Bay and Cook Inlet were all based in Portland and regularly passed in and out of Portland Harbor. Surely it was not unreasonable for a professional pilot, with knowledge of the duties of those in charge of these Government vessels with respect to floating aids to navigation, to assume that, in the absence of some notification to the contrary, or some storm or other known incident to account for displacement, the buoy was in its charted position.
 
 
 12
 (2) Official records disclosed and the testimony of the pilot was to the effect that the buoy had a good record of remaining in its charted position. For some months prior to the stranding there had been no bad storms or other conditions at all likely to affect the position of the buoy. In fact the cause of the displacement is still a complete mystery so far as appears in the record before us.
 
 
 13
 (3) Several of the local professional pilots testified and they confirmed Captain Wadleigh's statement that it was the custom not to take and plot bearings to check the position of West Cod Ledge Rock Buoy No. 2, and that they customarily relied on this buoy in piloting deeply-laden vessels in and out of Portland Harbor. Moreover, it appeared without contradiction that many other vessels similar to the Northern Gulf had during the period of displacement of the buoy passed over the same waters without incident.
 
 
 14
 The Government challenges Judge Tenney's statement in his opinion: 'The fact that other vessels successfully traversed the area is easily explainable since the 7' to 11'5' tide range would permit vessels drawing more than Northern Gulf to pass over the very same spot at high water.' We disagree with this criticism as the chart shows a depth of 32 feet at mean low water on the western tip of the ledge where the vessel stranded and she had a draft of 35'6' forward and aft.
 
 
 15
 (4) There were no ranges available to the pilot on his course from the Lightship to the vicinity of West Cod Ledge Rock Buoy No. 2, a circumstance of vital importance in view of the fact that the existence of ranges, the use of which would have immediately revealed the displacement of buoys, was the critical factor in some of the cases strongly relied upon by the Government. We shall discuss these cases later.
 
 
 16
 Thus, assuming the 'drastic' rule of The Pennsylvania not to be applicable under the circumstances of this case, we conclude that Judge Tenney properly found the Government solely to blame for the stranding.
 
 
 17
 However, as the Government has chosen, in its argument in favor of the applicability of the rule of The Pennsylvania, to rely upon several cases which bear only on the issue of negligence and which have, in our judgment, no relevancy to the issue of whether or not 33 C.F.R. Section 62.25-55 (1970) imposes a mandatory duty to take bearings on fixed landmarks and not to rely on buoys, we shall briefly discuss the cases principally relied upon, prior to our treatment of the rule of The Pennsylvania point.
 
 
 18
 The Government relies especially upon The Hercules, 81 F. 218 (N.D.Cal.1897). This is indeed 'a famous old case' and it is refreshing to read District Judge Morrow's salty opinion. While the case does involve a displaced buoy, there is no reference whatever to the much more famous opinion of Justice Strong in The Pennsylvania, decided in 1873. The importance of The Hercules and what made the case famous is that it formulated a principle to govern the duties of tugs toward their tows in 'crowded harbors.' Thus the crux of the case lies in the following statement, 81 F. at 226:
 
 
 19
 While it is true that there is a presumption that the buoys correctly indicate the places of danger, still it does not justify navigators, particularly masters of tugs, who are selected and employed for their supposed familiarity with obstacles to navigation in crowded harbors, in following blindly these signals of danger.
 
 
 20
 The towing operation in The Hercules consisted in moving the Benjamin F. Packard, a vessel 244.2 feet in length and 26.8 feet in depth, from the north side of a wharf in San Francisco Bay 'into the stream for the purpose of completing her loading.' Precisely opposite the wharf and only 475 feet away was Mission Bay Rock, a well-known obstacle to navigation. The buoy marking Mission Bay Rock had been displaced a distance of 200 feet. While the master of the Hercules did not know of this displacement, the court held that the duty of the master of a tug to his tow required him to be familiar with the presence and location of the rock. The holding was (81 F. at 225):
 
 
 21
 Applying the law as established by these cases, it follows that the master of the Hercules should have had such familiarity with the location of Mission Bay Rock, even though the buoy, indicating where it was, had been displaced some 200 feet. That distance, at the short range from Long wharf, where the towage began, was sufficient to have been observed by a careful pilot.
 
 
 22
 In fact the master of the Hercules did not even look to see if the buoy was where he could not have failed to know the rock was. All this, of course, has to do with the finding of fault on the part of the master, negligence pure and simple.
 
 
 23
 Philadelphia Electric Co. v. Curtis Bay Towing Co., 260 F.Supp. 505 (E.D.Pa.1966), aff'd, 390 F.2d 125 (3d Cir. 1968), also strongly relied upon by appellant, is practically a replica of The Hercules. No reference is made to 33 C.F.R. Section 62.25-55 (1970) or to the rule of The Pennsylvania. The master of a tug with a coal barge in tow, at what was close to low water, instead of proceeding directly to the channel adjacent to the Windy Point coal pier off the Philadelphia Naval Base, cut across Horseshoe Shoal, a well-known obstacle to navigation, in the immediate vicinity of the coal pier and fetched up. The court held the master of the tug solely at fault despite the displacement of a buoy that was supposed to mark both the shoal and the channel. This was because the buoy was 'so far removed from its charted position' that the master of the tug, who was perfectly familiar with local conditions off the coal pier, should have known that there was not sufficient water in the river to warrant navigation 'at the then stage of the tide.'
 
 
 24
 The various cases involving ranges apply the same principle. If a range is available all the navigator need do is to look up the range. If the buoy is on the range instead of where it is supposed to be the navigator is on notice that it has been displaced. And, if he fails to take the trouble to look, of course he is at fault. See Canada S.S. Lines, Ltd. v. Great Lakes Dredge & Dock Co., 81 F.2d 100 (7th Cir. 1935); Dibble v. United States, 295 F.Supp. 669 (N.D.Ill.1968); Standard Dredging Corp. v. S.S. Syra, 290 F.Supp. 260 (D.Md.1968); Humble Oil & Ref. Co. v. The Tug Crochet, 288 F.Supp. 147 (E.D.La.1968), aff'd, 422 F.2d 602 (5th Cir. 1970); Philadelphia Elec. Co. v. Curtis Bay Towing Co., supra; United States v. Sigfridson, 1964 A.M.C. 2341 (D.Ore.1963) (not otherwise reported); The Manhattan, 3 F.Supp. 75 (E.D.Pa.1932), aff'd per curiam, 63 F.2d 995 (3d Cir. 1933); The Miles Standish, 1928 A.M.C. 215 (S.D.N.Y. 1919) (not otherwise reported); The Somers N. Smith, 120 F. 569 (D.Me.1903).
 
 
 25
 The reliance by appellant upon so many cases that on their face appear to be clearly inapplicable to situations involving the violation of statutory duties and the rule of The Pennsylvania would seem to be due to that itch to pile up quotations with words or phrases that seem to fit the case in hand when torn from the context in which they were written. While we do not say any impropriety is involved, as practically every lawyer has at one time or another yielded to the temptation to do this, we do say this habit is not to be encouraged. It only serves to increase the labors of the judges and perhaps momentarily to confuse them.
 
 III.
 
 26
 The doctrine of The Pennsylvania has been applied to a great variety of situations, involving regulations as well as statutes.[2] Nor does the rule affect collision cases only.[3] It is of the essence of all these cases that the statute or regulation be mandatory in character, as the rule is designed to compel compliance with clearly defined duties. Typical instances are mandatory directions with reference to lookouts, fog signals and the carrying of lights at night. When the statute or regulation is in terms of cautionary suggestions only, then the alleged failure to take certain precautions in certain given situations is absorbed into the ultimate finding of fault or negligence or the absence of fault or negligence contributing to the loss and damage involved in the particular case.
 
 
 27
 It is not without significance, we think, that, despite the numerous cases where displaced buoys were part of the mise-en-scene of maritime collisions, strandings and other similar mishaps that have come under judicial scrutiny, this is the first time, as far as is revealed by our research, that the failure to 'utilize bearings from fixed objects and aids to navigation on shore' where buoys were off station has been claimed to warrant the application of the rule of The Pennsylvania. This may well be due to the heading of the Regulation, 'Caution,' and the absence of such phraseology as 'must' or 'shall.' Moreover, in cases with respect to lookouts, lights, fog signals and so on the precise duty owed by mariners in each instance is carefully spelled out. Here the very phrase 'should not rely completely' is inherently ambiguous at best, especially when closely followed by the phrase 'but should also utilize.' There would seem to be no middle ground. Either mariners are merely cautioned to be careful, especially where there have been storms, ice, fouling of a buoy by collision or other accident, which must mean storms, ice or accident known or likely to be known by the mariner in the particular case, or, as the Government appears to claim here, the navigator must take bearings and make calculations every time he is about to pass a buoy. What this amounts to is giving the Regulation an interpretation which construes the statement which only says mariners should not rely 'completely' on buoys in such a way as to say that mariners should not rely on buoys at all if they are able to take fixes. That such an innovation would be impractical and unenforceable seems apparent. And if it be said that the supposed mandatory requirement is applicable only to important buoys, guarding especially dangerous reefs, who is to decide which are the unimportant buoys as the vessel passes by?
 
 
 28
 Accordingly, we agree with Judge Tenney's conclusion that 33 C.F.R. Section 62.25-55 (1970) does not prohibit or mandate any particular conduct sufficient to invoke the drastic rule of The Pennsylvania.
 
 IV.
 
 29
 Because of a statement in Judge Tenney's opinion that may possibly be misconstrued, we shall add a few words on the subject of presumptions. Of course, the stranding of the Northern Gulf on a well-known and well-charted rocky ledge at the principal approach to Portland Harbor raised a presumption of fault,[4] and Judge Tenney so held. But this presumption ceased to be of any force and effect when Judge Tenney made his finding, based as we have seen on substantial evidence, that 'The fault of the Coast Guard in failing to maintain Buoy No. 2 on its charted position is established as the sole proximate cause of the stranding of Northern Gulf.' The type of presumption discussed in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84 (1893) and quoted in Judge Tenney's opinion at 309 F.Supp. 658-659 is of a wholly different character and does not affect the disposition of the issues in the case before us.
 
 
 30
 Affirmed.
 
 
 
 [1]
 Section 62.25-55 Caution
 (a) Buoys are liable to be carried away, shifted, capsized, sunk, etc.; lighted buoys may be extinguished or sound buoys may not function as the result of storm, the accumulation of ice, running ice or other natural causes, collision or other accident.
 (b) For the foregoing reasons, mariners should not rely completely upon the position or operation of floating aids to navigation, but should also utilize bearings from fixed objects and aids to navigation on shore.
 
 
 [2]
 Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218 (1893); In re Kinsman Transit Co., 338 F.2d 708 (2d Cir. 1964), cert. denied, Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965); Rowe v. Brooks, 329 F.2d 35 (4th Cir. 1964); Afran Transp. Co. v. The Bergechief, 274 F.2d 469 (2d Cir. 1960); United States v. The J. A. Cobb, 283 F.2d 754 (2d Cir. 1960); Merritt-Chapman & Scott Corp. v. Cornell S.S. Co., 265 F.2d 537 (2d Cir. 1959); O/Y Finlayson-Forssa A/B v. Pan Atl. S.S. Corp., 259 F.2d 11 (5th Cir. 1958), cert. denied, 361 U.S. 882, 80 S.Ct. 153, 4 L.Ed.2d 119 (1959); Diamond State Tel. Co. v. Atlantic Ref. Co., 205 F.2d 402 (3d Cir. 1953); Tide Water Associated Oil Co. v. The Syosset, 203 F.2d 264 (3d Cir. 1953); Leathem Smith-Putnam Nav. Co. v. National Union Fire Ins. Co., 96 F.2d 923 (7th Cir. 1938)
 
 
 [3]
 Waterman S.S. Corp. v. Gay Cottons, 414 F.2d 724 (9th Cir. 1969); Commercial Transp. Corp. v. Martin Oil Serv., Inc., 374 F.2d 813 (7th Cir. 1967); Atlantic Pipe Line Co. v. Dredge Philadelphia, 247 F.Supp. 857 (E.D.Pa.1965), aff'd per curiam, 366 F.2d 780 (3d Cir. 1966)
 
 
 [4]
 Brown & Root, Inc. v. American Home Assur. Co., 353 F.2d 113, 117 (5th Cir. 1965), cert. denied, 384 U.S. 943, 86 S.Ct. 1465, 16 L.Ed.2d 541 (1966); Philadelphia Elec. Co. v. Curtis Bay Towing Co., 260 F.Supp. 505, 512 (E.D.Pa.1966), aff'd, 390 F.2d 125 (3d Cir. 1968); Indian Towing Co. v. United States, 182 F.Supp. 264, 270 (E.D.La.1959), aff'd, 276 F.2d 300 (5th Cir.), cert. denied, 364 U.S. 821, 81 S.Ct. 56, 5 L.Ed.2d 51 (1960); New York Trap Rock Corp. v. The Dynamic, 50 F.Supp. 507, 508 (E.D.N.Y.1942), aff'd per curiam, 136 F.2d 683 (2d Cir. 1943); The Helen B. Moran, 255 F. 342, 344 (E.D.N.Y.1918)