RICHMOND MARINE PANAMA, S.A., in personam, and the SS OLYMPIC PIONEER, her engines, boilers, tackle, etc., in rem, Plaintiff,

v.

UNITED STATES of America, Delships Inc., and the S. T. GULFSPRAY, her engines, boilers, etc., Defendants.

No. 67 Civ. 5012.

United States District Court, S. D. New York.

Nov. 14, 1972.

Healy & Baillie, New York City, for plaintiff by Bruce A. McAllister, John C. Koster, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., for United States by Gilbert S. Fleischer, Philip A. Berns, New York City, of counsel, Admiralty and Shipping Section, Dept. of Justice.

Burlingham, Underwood & Lord, New York City, for defendants Delships Inc. and S. T. Gulfspray by Joseph C. Smith, New York City, of counsel.

GURFEIN, District Judge.

■ This is an action by the plaintiff, Richmond Marine Panama, S. A., to recover damage to its vessel, Olympic Pioneer when she touched bottom on February 12, 1967 in the vicinity of the junction of the Chester Range and the Marcus Hook Range of the Delaware River. There is a buoy 1C maintained by the United States Coast Guard in that vicinity. The suit against the United States is based on the theory that the United States was negligent in placing and maintaining buoy 1C in that the buoy was beyond the channel rather than at its outer edge as shown on the chart customarily used by mariners. Such a suit against the United States is properly brought in admiralty for which a remedy is provided under the Suits in Admiralty Act, as amended in 1960, 46 U.S.C. § 741 et seq. Afran Transport Company v. United States, 309 F.Supp. 650 (S.D.N.Y.1969), aff'd 435 F.2d 213 (2 Cir. 1970), cert. denied, 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971) or under the Public Vessels Act, 46 U.S.C. §§ 781–790, on the theory that the Coast Guard buoy tender was negligent.

Delships Inc. (Delships) the owner of the S. T. Gulfspray was thereafter joined as a defendant and the vessel was sued in rem. The United States then cross-claimed against these additional defendants and joined the Olympic Pioneer. There is jurisdiction under the admiralty and maritime jurisdiction of the Court, 28 U.S.C. § 1333(1).

Delships and Gulfspray were sued on the theory that Gulfspray crowded Olympic Pioneer contrary to the Inland Rules of Navigation and caused her to come too close to buoy 1C. At the trial witnesses testified for the respective parties and depositions of others were received in evidence.

## THE CLAIM AGAINST DELSHIPS AND GULFSPRAY

Olympic Pioneer, a Liberian flag vessel, owned by the plaintiff Richmond Marine Panama, S.A., having a length of 576 feet and a beam of 75 feet departed Philadelphia for sea the morning of February 12, 1967, laden with a cargo of 24,240 tons of scrap metal to a mean draft of 34 feet 8 inches.[1] She took on bunkers at the Mantua Creek Anchorage. She left the anchorage and headed for sea at 1139 hours. Soon after noon she turned onto the Chester Range of the Delaware River, proceeding outbound. The weather was clear.[2] Pilot James L. Miller, Jr., a duly licensed Delaware River pilot, was at the conn.[3] Her second officer was standing by the engine room telegraph and a helmsman was at her wheel. The master, Captain Katravas was somewhere on the bridge but apparently not in communication with the pilot.

The Chester Range channel is 800 feet wide and is marked by a fixed range on the center line of the channel. There is a buoy 4C on the eastern channel line about midway on the range, which is about 1.82 miles long. Where the channel changes direction onto the Marcus Hook Range there are two buoys marking the change in direction, buoy 1C on the westerly side of the channel and buoy 2C on the easterly side and slightly to the north. The project channel has a depth of 40 feet at mean low water.[4] The tide at the time was flooding to-

---

1. Due to the "squat" of the vessel when underway approximately another foot would be added to the draft which with a 2 inch sag in midships would make a draft of 36 feet 2 inches (Tr. 50–51; Katravas deposition, P.Ex. 12, pp. 24–27, 117–118).

2. Miller deposition, GS Ex.J, p. 11; Foster deposition, GS Ex.G, p. 16; Lootz deposition, GS Ex.A, pp. 16–17.

3. GS Ex.J, pp. 13–14, 52–53; Tr. 10.

4. Griffin, P.Ex. 38, pp. 9, 5; Tr. 108.

ward the west at about 1.5 knots in the vicinity of buoy 1C.[5]

As Olympic Pioneer proceeded down the Chester Range, Pilot Miller noticed congestion ahead on the next range, the Marcus Hook Range inbound. One of the vessels was defendant Delships' Gulfspray, a fully loaded oil tanker which was being navigated by Captain R. C. Foster, also a duly licensed pilot for the Delaware River.[6] Gulfspray's master and second mate were also on the bridge.[7]

At the time Gulfspray was sighted, Olympic Pioneer was close to mid-channel or slightly favoring the Pennsylvania side or western side.[8] Her pilot, upon sighting Gulfspray, slowed the vessel to dead slow ahead and her course was changed by a rudder order to "come right." There was a subsequent order of "steady" but no check was made of the gyro course. It was believed that the changed course would make her pass 75 to 100 feet off buoy 1C. There was no further alteration of her course until Olympic Pioneer grounded in the vicinity of buoy 1C about thirteen minutes later.[9]

At the time Olympic Pioneer changed her course, while abeam of buoy 4C, Gulfspray was at least partially out of the eastern line of the channel and in the quarantine anchorage adjacent to the Marcus Hook Range.[10] She had altered her course to starboard approximately three degrees to pass astern of the Spencer which was maneuvering away from the Sinclair dock and obstructing Gulfspray's passage.[11] Gulfspray, after clearing the Spencer, altered her course to port and proceeded inbound on her own starboard side of the channel. Olympic Pioneer and Gulfspray passed port to port in the vicinity of buoys 1C and 2C.[12] The plaintiff contends that Gulfspray was either in mid-channel or west of the center line of the channel, contrary to the Inland Rules of Navigation [13] and that she crowded Olympic Pioneer.

The plaintiff's contention that Gulfspray was near mid-channel and west of it when passing Olympic Pioneer has not been established by a preponderance of the evidence. The plaintiff contends that the statutory violation of the Inland Rules of Navigation by Gulfspray places upon her the burden of proving that her fault did not contribute to the grounding of Olympic Pioneer. But that assumes the basis for establishing the burden of proof—that Gulfspray was, in fact, over the center line of the channel.

Pilot Miller who was at the conn of Olympic Pioneer, testified at the Coast Guard hearing soon after the accident. At that time he made no charge against Gulfspray for crowding Olympic Pioneer. He there testified that he did not think Gulfspray hindered his navigation.[14] At the trial the plaintiff did not call him as a witness. Nor at the time of the incident did he signal

5. GS Ex.G, pp. 39–40.

6. GS Ex.J, pp. 20–26; GS Ex.G, p. 4.

7. Forrest, Tr. 199, 208; GS Ex.G, pp. 4–5, 57; GS Ex.A, pp. 7–8.

8. P.Ex. 12, p. 40; P.Ex. 7; GS Ex.J, p. 41.

9. P.Ex. 12, pp. 64–67, 90–98; P.Ex. 7; P.Ex. 12, pp. 55–56; Tr. 57–60, 85–87. The helmsman was not called to testify.

10. P.Ex. 12, p. 41; P.Ex. 7.

11. Forrest, Tr. 203–04; P.Ex. 41.

12. GS Ex.G, pp. 10, 16, 45–49; GS Ex. J, pp. 40–42, 69; Forrest, Tr. 213, 242–43.

13. Article 25 (33 U.S.C. § 210) reads:
"§ 210. Steam vessel in narrow channel (Art. 25).
In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel. In narrow channels a steam vessel of less than sixty-five feet in length shall not hamper the safe passage of a vessel which can navigate only inside that channel."

14. P.Ex. 11, p. 24.

Gulfspray by danger signal or telephone asking her to change her course to starboard to avoid crowding him. The rudder order to the helmsman of Olympic Pioneer to "come right" was given when Gulfspray was coming out of the quarantine anchorage, thirteen minutes away. And that heading, after steadying, was never changed. This hardly lends plausibility to the contention that the alleged crowding actually affected the course of Olympic Pioneer.

The plaintiff attempted to bolster its position by calling a hydrodynamics expert, Mr. Suarez. There was objection to his testimony on the ground that specific facts to support any theoretical conclusion of the trajectory of Gulfspray's passage which he had plotted were not proved. Decision was reserved. I will allow it in evidence. I have considered the testimony and graphs of Mr. Suarez which put Gulfspray in mid-channel or slightly to the west abeam of buoy 1C at 1234 hours.[15] The first assumption of Mr. Suarez was that Gulfspray, while passing buoys 1M and 6M, south of the Sun Oil dock and the Sinclair dock, was in mid-channel. There is no recorded observation to support this, and the testimony of second mate Lootz of Gulfspray was based on what was normally the lateral position of the vessel abeam 1M, "on the ranges," rather than her position on that particular day. The assumption appears contrary, moreover, to Gulfspray's testimony that she was at the outer eastern edge of the channel and into the quarantine anchorage when she passed astern of the Spencer, a fact confirmed by the observation of Katravas, the master of Olympic Pioneer, and Pilot Miller.[16] Mr. Suarez conceded (and actually marked a trajectory accordingly), that if Gulfspray was in the anchorage she would have been in the starboard channel at buoy 1C at 1234 hours when the vessels allegedly passed each other.[17]

Another weakness in Mr. Suarez's testimony was his assumption that Gulfspray was opposite buoy 1C precisely at 1234 hours. There is evidence that she commenced her change of course for the Chester Range at 1232 hours and that she would normally change course at about that point in the river in order to stay on the proper side of the channel.[18] In that event she could not have been opposite buoy 1C at 1234. And her position at 1234 hours would not be meaningful.

The plaintiff has a further argument. The channel is 800 feet wide. Olympic Pioneer grounded within 50 to 100 feet from the buoy (which was 80 feet outside the channel). Captain Foster, pilot of Gulfspray, estimated that he passed Olympic Pioneer at a distance of 300 feet. Each vessel had a beam of about 75 feet. Hence, it is argued that by Foster's own admission he had to be either in mid center of the 800 foot channel or on the westerly side. The difficulty with this reasoning is that distances on water are, as is well known, deceptive and imprecise and no record was made at the time. Since Captain

15. To calculate the motion or trajectory of the vessel Mr. Suarez considered several variables in his mathematical computations. These variables include the displacement of the vessel, the relationship between the terminal ship speed as a factor of the propeller r. p. m., the thrust and resistance of the vessel to the water, the direction and speed conditions of the water, the angular time history of the vessel, and the engine or deck log which contains the various engine orders. On the basis of these facts Mr. Suarez calculates the motion of the vessel with respect to the gyro or the true-north orientation and plots the vessel's location on the chart. Mr. Suarez did not account for the pitch of the propeller in determining velocity of Olympic Pioneer. He considered this unnecessary since he had been supplied with the terminal velocity of the vessel which corresponded to the respective engine orders. Suarez, Tr. 120–26, 134–35.

16. Tr. 203–04; P.Ex. 12, pp. 90–93; P. Ex. 7; GS Ex.J, p. 31.

17. Tr. 147.

18. Forrest, Tr. 205–09, 231, 233–34; 207, 242–43.

Foster knew the width of the channel, his testimony can hardly be contrived and tends to support my impression that he was a credible witness. Captain Foster testified that he took no note because it had seemed like a normal passing and he did not know that the passing vessel had grounded.[19] In sum, I find that the plaintiff has failed to establish by a preponderance of the evidence that Delships and Gulfspray were at fault in the grounding of Olympic Pioneer.

## THE CLAIM AGAINST THE UNITED STATES

■ The claim against the United States is that buoy 1C was not on station as shown on CGS chart 295 and that the failure to maintain the buoy on proper station was negligence. There is no doubt that the buoy was an "aid to navigation which the Coast Guard is charged with establishing and maintaining." 14 U.S.C. § 81. There is no doubt, as well, that such duty when undertaken must be carried out without negligence. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and extends to the care and maintenance of buoys. Afran Transport Co. v. United States, *supra*.

The Coast Guard operated and maintained Chester Range Lighted Bell Buoy 1C. It was a black buoy, 8 feet by 23 feet, moored with a 90 foot 1¼ inch chain to an 8,500 pound concrete sinker. It was shown on the Light List (No. 2262) as being in 36 feet of water southeasterly of a rock ledge and the

Coast Guard sounding on February 8, 1967 was in accord.[20]

Olympic Pioneer at the time of her grounding did not know her actual heading.[21] Nor was it established at exactly which spot she touched bottom.[22] On the other hand there is no proof that she was actually outside the channel.[23] When she struck she rocked from port to starboard but there was no grounding. After quick maneuvering she floated off within moments.[24] Although the plaintiff brought Mr. Suarez to plot a trajectory for Gulfspray it failed to use his services in a similar capacity for Olympic Pioneer. Her master testified that the gyro compass had a standard error of 1 degree east or west, but he did not remember which it was. The pilot was not told of this error.[25] In any event, the pilot did not use the gyro and up to the time of touching did not know the true heading of his ship although there was testimony by Captain Marshall, plaintiff's expert, that in this dangerous area checking the gyro reading was essential to proper navigation.[26]

Buoy 1C is in an important location because in its vicinity there is a rock ledge. This rock ledge is on the charts and is known to pilots as a critical area. Besides buoy 1C there are other aids to navigation that can be utilized to determine position. There is an overhead power cable in its vicinity whose lowest point of sag roughly indicates the center of the channel.[27] Fixed ranges with continually operating lights were located to the stern of an outbound vessel on the Chester Range and forward of such a

19. Tr. 230, 232.

20. Govt.Ex.D; Tr. 344.

21. See supra, n. 9.

22. P.Ex. 12, pp. 11–14; 54–55; 79–84.

23. The mid-channel course for the Chester Range was 231 degrees. After the touching, the second mate recreated the geographical procedure showing the heading of Olympic Pioneer at approximately 235 degrees true. P.Ex. 8; Tr. 58–59; P.Ex. 16, 37–38, 42–44. If the heading after the rudder order was 3.5 degrees to 4 degrees off the center line course and no

further change was made in the heading, her course could well have taken her outside the westerly edge of the channel. The plaintiff contends, however, that if the buoy had been on proper station the pilot would have changed course.

24. P.Ex. 12, pp. 50, 54, 69–70; GS Ex.J, p. 51.

25. P.Ex. 12, pp. 11–18; GS Ex.J, 30–33.

26. P.Ex. 12, pp. 18–19; GS Ex.J, pp. 32–33; Tr. 59.

27. Tr. 14–15.

vessel on the Marcus Hook Range. Each of the ranges indicated the center of the particular channel when the two structures in each set were directly lined up, one over the other.[28] The pilotage of Olympic Pioneer from the time she left 4C was performed by "eyeball" without the use of navigational instruments.[29]

After the incident, the United States Army Corps of Engineers on February 15, 1967 found that, on flood tide, buoy 1C was approximately 80 feet to the northwest of the channel line.[30] The Coast Guard tender "Lilac" on February 8, 1967, only four days before the incident, while performing an annual servicing of buoy 1C had found it off-station and claims to have replaced it on charted position.[31] Immediately after the incident, on February 12, personnel from the Lilac again checked the position of buoy 1C by taking horizontal sextant angles and again reported it to be on station.[32]

The apparent discrepancy between the finding of the Army Corps of Engineers and the Coast Guard can be partially explained. The Corps plots the position of the floating buoy itself on the surface of the water. The Coast Guard plots the position at which it drops the *sinker* to which the buoy is attached by a chain. The floating buoy is not always directly above the sinker and, hence, the Coast Guard acknowledges that there may be a swing of the surface buoy within the radius of the chain.[33] And when the buoy is affected by current and wind its exact position is not necessarily the position shown for the sinker.[34]

CGS 295, the chart used for navigation in the area, had a scale of 40,000 to 1. On that scale the buoy marking,

which is a black dot, represents a diameter of 100 feet.[35] When the Coast Guard places a buoy it puts the sinker, not the buoy itself, within the 100 foot diameter of the dot on the chart.[36] It obviously cannot always get the sinker positioned in the very center of the dot, the bull's eye, but it reports the buoy as being on proper station if the sinker is anywhere within the diameter of the dot.[37] Although the Corps reports the floating buoy itself off station, the Coast Guard insists that the sinker of the buoy is within the black dot and that the buoy is, therefore, on proper station. We do not have to decide the legal result if that were true, since the finding is that the sinker was not within the black dot.

The ultimate question of fact is whether the buoy on the surface could have been 80 feet outside the channel and yet have been properly positioned within the 100 foot diameter of the black dot which represented the position of buoy 1C to mariners. If the pilot believes that a buoy on the surface is in the center of the black dot and the sinker is, instead, on the very edge of the dot, there could actually be a disparity of 130 feet. The Coast Guard contends that in that case the buoy would still be on station.[38] 130 feet is a long distance, about one-third of the distance to mid-channel, and it is difficult to accept the view that this is a proper representation of the true position of the buoy itself.

It is true that if the sinker was dropped at the edge of the channel in 36 feet of water, the scope of a 90 foot chain would allow a theoretical swing of about 81 to 84 feet maximum. That was the view of Mr. Brogdon of the Coast

28. Marshall, Tr. 12, 13–14.

29. P.Ex. 12, pp. 16–17, 21–23; GS Ex.J, pp. 7–8.

30. Tr. 352; P.Ex. 8, 13, P.Ex. 38, 30–31.

31. Mills, Tr. 345–47.

32. Mills, Tr. 353–55; 362–64; 370–77; 403–04; Govt.Ex. 28.

33. Mills, Tr. 331.

34. Mills, Tr. 331.

35. Mills, Tr. 322; 284–85.

36. Marshall, Tr. 76–77; 323–25.

37. Mills, Tr. 331, 341–43.

38. Brogdon, Tr. 324–25.

Guard Training Center.[39] So the question boils down to whether it is likely, given the conditions affecting buoy 1C on the Delaware River, that a buoy found floating 80 feet from its charted position was properly positioned in the first instance. This requires a consideration of current and wind as well as inquiry into the accuracy of Coast Guard methods of positioning buoys as explained at the trial.

In the first place, a displacement of the buoy by 80 feet would require the 90 foot chain to be almost taut, the buoy having travelled almost the maximum distance allowed by the scope of the chain. There is nothing in the evidence to suggest so strong an effect by flood, current or wind. Brogdon estimated that in a 15 knot southeasterly wind with a current northward of about 1.5 to 2 knots, he would expect the buoy to be some distance northeast [sic] (he meant northwest) of where its sinker was.[40] He thought it would be the current that would normally swing the buoy northward. The testimony of Captain Marshall, the President of the Pilots' Association, as well as Captain Mills[41] was that the current in the vicinity of buoy 1C was principally north and south with little lateral movement when the current was running.[42] Although there was some setting to the west on both flood and ebb tides, there were no conditions of tide when buoy 1C would move 50 feet.[43] Mills, the master of the Coast Guard tender Lilac which put the buoy into position, did not know how much the buoy would swing on the surface,[44] and estimated that the buoy could not drift much to the west.

Second, Mills, the skipper of the Coast Guard tender himself also testified at one point that the buoy could not be 80 feet away from the charted position.[45]

Moreover, the accuracy of the Coast Guard positioning by sextant angles is somewhat doubtful. The log cards of the Lilac were hardly a paradigm of nautical bookkeeping. Sextant angles were reversed on February 8, 1967[46] and its bearings taken on March 2, 1967 and February 24, 1967, attempted in the courtroom, simply did not plot out at all. The bearings taken after the grounding were not taken by officers of the Coast Guard,[47] but by non-commissioned officers who went out in a 40 foot boat to take the bearings (and the actual sextant angles taken that day were not preserved).[48] There was no resetting of the buoy that day, according to the Coast Guard report, and it must be assumed that the position of the buoy reported to be on station was the position of the buoy itself, not the sinker.[49] If that is so, the report of the men who went out in the 40 foot boat is not persuasive. We do not know their sextant angles, and we know that the Engineers three days later found the same buoy 80 feet off station on flood tide. Mills conceded that the Engineers' method of plotting position was superior and that if he had had the Engineers' charts and paraphernalia he would have been able to fix the position of the buoy more accurately.[50]

The Government contends, however, that the Army Engineers surveys showing buoy 1C to be 80 feet off station were available to mariners. It is not clear from the evidence that these surveys were actually distributed to all the pilots.[51] In any event, it does not sit well for the Coast Guard tender commander to disclaim knowledge of the

39. Tr. 279.

40. Tr. 302–05.

41. See Mills, Tr. 369.

42. Tr. 36, 37.

43. Tr. 73.

44. Tr. 332.

45. Mills, Tr. 382.

46. Mills, Tr. 358, 361.

47. Mills, Tr. 389–90.

48. Mills, Tr. 380.

49. Mills, Tr. 354.

50. Mills, Tr. 392.

51. Cf. Marshall, Tr. 87–88, Brogdon, Tr. 300–01.

survey[52] and for the Coast Guard to expect pilots to request it. The suggestion that the Coast Guard would not have done anything about the survey even if it had known about it, because under its terminology the buoy was, nevertheless, on station is not convincing, as we have seen, in the light of conditions existing in the area. And the Government itself brought out that after the incident of February 12, 1967 the buoy was moved inside the channel, easterly of its former position.[53]

In the absence of some suspicious circumstance or notice, navigators are entitled to rely on the representations made in the Government charts relative to the location of buoys. Afran Transport Co. v. United States, *supra*, 435 F.2d at 215 and cases cited; see The Clevelander, 83 F.2d 947, 949 (2 Cir. 1936). Russell, Poling & Co. v. United States, 252 F.2d 167, 170 (2 Cir. 1958).

I find that buoy 1C was off the station shown on the chart on February 12, 1967, and that the Coast Guard was negligent. I so find without passing on whether the knowledge of the Army Corps of Engineers is imputed to the Coast Guard, cf. Philadelphia Electric Co. v. Curtis Bay Towing Co. of Pa., 260 F.Supp. 505, 511 (E.D.Pa.1966), aff'd 390 F.2d 125 (3 Cir. 1968), though I believe that an Army Corps party surveying depths should be in touch with the Coast Guard tender in the same area. Lack of liaison is unfair to mariners.

I also find Olympic Pioneer contributorily negligent. While buoy 1C was not sufficiently off station for that condition to be detected by eyesight,[54] the rock ledge was a danger to navigation and known to the river pilots as such.[55] The order for the rudder change by the pilot without checking the gyro himself or requesting the information from the helmsman was negligence.[56] To approach the dangerous rock ledge without knowing the heading was reckless. The ship should have been conned by true degrees, in the opinion of Captain Marshall.[57] A shift to starboard of four degrees would bring her west of the channel edge.[58] We have learned that an eyeball estimate of a lateral distance of 75 feet especially from a bridge located 400 feet aft of the bow could easily invite an error of 30 or 40 feet.[59] And, as Captain Marshall agreed, it would not be safe for a heavily laden 75 foot beam vessel with the draft of Olympic Pioneer to pass less than 50 to 100 feet from the buoy. In an 800 foot channel, as Captain Marshall observed, a vessel like Olympic Pioneer should stay on the range in mid-channel in passing this dangerous ledge,[60] and if an inbound vessel is crowding she should be signalled to move over.[61] Mills agreed that he, too, would have gone downstream on the range.[62]

In sum, while I do not hold that the conduct of the pilot of Olympic Pioneer involved a breach of any statute or regulation, see Afran Transport Co. v. United States, *supra*, 435 F.2d at 218–19, his failure to take the precautions mentioned in the given situation is, in Judge Medina's language, "absorbed into the ultimate finding of fault or negligence." Afran Transport Co. v. United States, *supra*, at 219; *cf.* C.F.R. 33, § 62.25 [1970].

The plaintiff will, accordingly, be awarded half damages against the Unit-

52. Mills, Tr. 391.

53. Marshall, Tr. 111.

54. Mills, Tr. 395.

55. Mills, Tr. 356.

56. Marshall, Tr. 60.

57. Tr. 85.

58. Marshall, Tr. 58–59.

59. Marshall, Tr. 55–56.

60. Tr. 67.

61. Marshall, Tr. 38.

62. Tr. 383.

ed States, with prejudgment interest from the date of the filing of the suit. Afran Transport Co. v. United States, *supra,* 309 F.Supp. at 652. If the parties cannot agree on the amount further application should be made to the Court. The complaint against Delships and Gulfspray is dismissed.

The foregoing shall constitute findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

### SUPPLEMENTAL OPINION

In the opinion awarding half damages against the United States I also ordered prejudgment interest from the date of the filing of suit. I relied on Afran Transport Co. v. United States, 309 F. Supp. 650, 652 (S.D.N.Y.1969) which was affirmed, 435 F.2d 213 (2 Cir. 1970), cert. denied, 404 U.S. 872, 92 S. Ct. 72, 30 L.Ed.2d 116 (1971), where the District Court had awarded prejudgment interest from the filing of the complaint. The general ground for liability there was the same as in this case—the improper positioning of a warning buoy causing damage to the plaintiff's vessel.

The Government now moves for an order pursuant to Rule 59 of the Federal Rules of Civil Procedure to amend the conclusions of law to conform with the Public Vessels Act, 46 U.S.C. §§ 781–790 inclusive, and more specifically, 46 U.S. C. § 782, which provides that "no interest shall be allowed on any claim up to the time of the rendition of judgment" against the United States.

The determination of this question requires a review of the history of the waiver of governmental immunity by the United States in admiralty causes and of the correlative statutory provisions concerning the payment of interest by the United States.

The United States had accumulated a large fleet of merchant vessels during World War I and the Congress saw fit to waive sovereign immunity in the Suits in Admiralty Act, enacted in 1920, Act of March 9, 1920, c. 95, 41 Stat. 525, 46 U.S.C. § 741. Section 3 of that Act, 46 U.S.C. § 743 et seq. provided that "[i]nterest shall run as ordered by the court." The Suits in Admiralty Act limited the waiver of immunity to damages flowing from "merchant ships" owned by the United States although an actual collision was not necessary to ground liability. See Canadian Aviator Ltd. v. United States, 324 U.S. 215, 221–25, 65 S.Ct. 639, 89 L.Ed. 901 (1945).

In 1925, the Congress determined to waive sovereign immunity not only with respect to damage caused by merchant ships but also by "public vessels" owned or controlled by the United States. The Public Vessels Act, Act of March 3, 1925, c. 428, 43 Stat. 1112, 46 U.S.C. § 781 et seq. was enacted. In Section 2 of that statute it was provided that "no interest shall be allowed on any claim up to the time of the rendition of judgment unless upon a contract expressly stipulating for the payment of interest."

In 1946 there was enacted the Federal Tort Claims Act, Act of August 2, 1946, c. 753, § 402, 60 Stat. 842, 28 U.S.C. § 2671 et seq. It included a provision for the exception from that Act of any claim for which a remedy is provided in the Suits in Admiralty Act or the Public Vessels Act, 46 U.S.C. §§ 741–752, 781–790, relating to claims or suits in admiralty against the United States, 28 U.S. C. § 2680(d). That statute also provided that the United States "shall not be liable for interest prior to judgment" (28 U.S.C. § 2674).

Confusion arose with respect to the selection of a proper forum for admiralty claims—whether the Court of Claims or the District Courts—and which statute of limitations was applicable, matters which do not concern us here. For an interesting history of the statutory confusion, see the discussion

of Chief Judge Brown in De Bardeleben Marine Corp. v. United States, 451 F.2d 140 (5 Cir. 1971). Suffice it to say that important amendments were made to the Suits in Admiralty Act, which included a redraft of Section 2, Act of September 13, 1960, Pub.L. 86–770, § 3, 74 Stat. 912, 46 U.S.C. § 742. The amended section provided that an appropriate non-jury proceeding in personam may be brought against the United States not only, as formerly, "[i]n cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained," but also in cases where "if a private person or property were involved, a proceeding in admiralty could be maintained." This rather vague language has been construed as "bringing all maritime claims against United States vessels into the admiralty jurisdiction of the district courts" under Section 2 of the Suits in Admiralty Act, the restriction of that Act "to merchant vessels having been stricken in 1960, 74 Stat. 912." Ira S. Bushey & Sons, Inc. v. United States, 398 F.2d 167, 169 (2 Cir. 1968). It also included maritime claims where no vessel was involved.* The spill-over of Suits in Admiralty Act jurisdiction on Public Vessels Act jurisdiction since the 1960 amendment is manifest.

Perhaps the obscurity explains why careful courts have lumped the two statutes as jointly supporting liability, see Lettsome v. United States, 411 F.2d 917, 918 (5 Cir. 1960); United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189, 195 (1 Cir. 1967), and why our own Court of Appeals in an admiralty suit against the United States did not even mention under which statute sover-

eign immunity had been waived. See Afran Transport, *supra.*

When the 1960 amendment to the Suits in Admiralty Act was adopted the Congress paid no attention to the question of prejudgment interest. A perusal of the Senate Report, see S.Rep.1894, 86th Cong. 2d Sess., 1972, 2 U.S.Code Cong. & Admin. News, p. 3583 et seq. and the correspondence therein contained, reflects no awareness of the problem of interest. When the amendment to the Suits in Admiralty Act was adopted it left intact the provision that "interest shall run as ordered by the Court."

We must conclude, therefore, that in an action in admiralty against the United States brought under the Suits in Admiralty Act the Court may award prejudgment interest, while in an action in admiralty against the United States brought under the Public Vessels Act "no interest shall be allowed on any claim up to the rendition of judgment."

This anomaly can hardly be wished away on some formulation of legislative intent in view of the clear history of the 1960 amendment showing that the matter was not considered.

The solution seems to lie either in looking solely to the allegations of the complaint to determine under which statute the claim for relief is made, or to analyze the ultimate facts found to see if any conclusion can be reached that one statute rather than the other was applied.

The Government argues that my ultimate finding was that the Coast Guard cutter, a "public vessel," was negligent and that, hence, recovery must have been based on the Public Vessels Act. But, as we have seen, liability would have been imposed on the negligent mis-

---

* Although *subsequent* Congressional explanation of the meaning of a statute is not binding on the courts, it is interesting to note, nevertheless, that a Senate Report of August 17, 1972 explained that the 1960 amendment extends jurisdiction under the Suits in Admiralty Act "to the full range of admiralty cases which

might have been maintained had a private person or property been involved rather than the Government or its agents and employees or property." Senate Report No. 92–1079, 92d Cong., 2d Sess., 1972, 9 U.S.Code Cong. and Admin. News, pp. 4045, 4050.

positioning of the buoy even if no vessel had been involved, if the negligence had been that of a shore-based lifeboat station, for example. See Afran Transport, *supra*.

The complaint in this case relies, moreover, on the Suits in Admiralty Act, not the Public Vessels Act. Since the Suits in Admiralty Act is now so broadly construed, it seems to me to support the award of interest in this case without more.

Accordingly, while I am conscious of Mr. Justice Holmes' admonition that to impose liability for interest on the United States one must have the express words of a statute, see Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 47, 49 S.Ct. 52, 73 L.Ed. 170 (1928), I find such express words in the Suits in Admiralty Act.

▮ Nevertheless, since the Congress in 1925 and again in 1946 specifically rejected prejudgment interest in suits against the Government, we may assume that the contrary provision in the Suits in Admiralty Act is now an oversight if it covers more than merchant ships. If the language of that Act had been mandatory, I would, nevertheless, deem the Court bound by the legislative determination. Since the granting of prejudgment interest is, in any event, discretionary, I shall in the exercise of discretion, reconsider my decision and withdraw the granting of interest. I do so because the Afran Transport, *supra*, did not necessarily involve a public vessel and was, therefore, not a case where *both* statutes permitting admiralty suits against the United States, seem to apply on the same facts. Perhaps the Congress will some day eliminate the statutory dilemma.

The motion of the United States to amend the conclusions of law to provide that no prejudgment interest shall be payable is granted as a matter of discretion.

It is so ordered.