**Steven GERCEY, Decedent, Michael B. Gercey and Madeline M. Gercey, parents and next-of-kin**

v.

**UNITED STATES of America.**

Civ. A. No. 74–29.

United States District Court, D. Rhode Island.

Feb. 6, 1976.

that other members of free society are admitted for like purposes.

Abraham Goldstein, Providence, R.I., for plaintiffs.

Lincoln C. Almond, U.S. Atty., R.I., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., Alfred H. O. Boudreau, Jr., Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., for defendant.

## OPINION

PETTINE, Chief Judge.

On May 19, 1973, the Motor Vessel COMET sank off Point Judith, Rhode Island, with a loss of sixteen lives, including that of Steven Gercey, the plaintiffs' decedent. The plaintiffs in this wrongful death action allege that the United States Coast Guard failed to use due care in carrying out its statutory duty of insuring the safety of passengers upon vessels that are required to be inspected and certified as safe for passenger travel and is therefore liable to the decedent's estate in an amount over $500,000. The matter is presently before the Court on defendant's motion pursuant to Rules 12(b)(6) and 12(c) of the Fed.R.Civ.P. for judgment on the pleadings, on the grounds that plaintiffs have failed to state a claim upon which relief can be granted.

I

The proposed findings of fact of both the plaintiffs and the defendant agree on most major points. The vessel COMET was built of wood in 1941, weighed 15 gross tons, was about 49 feet in length, and was powered by a 165 horsepower diesel engine. In the spring of 1970, while under the ownership of the National Youth Science Foundation, the vessel was leased by the University of Rhode Island School of Oceanography. Upon entering Rhode Island waters and a new Coast Guard inspection zone, the COMET was inspected by an officer of the Coast Guard Marine Inspection Office and after correction of a number of defects was found to have met all the requirements for a new certificate of inspection on July 22, 1970.

The COMET was next inspected by the Coast Guard on May 19, 1971, while the vessel was in dry dock. A number of defects were found, and the plaintiffs allege that the inspector was able to penetrate completely the hull plankings with a blunt screwdriver. The certificate of inspection was removed from the vessel and on the following day the University of Rhode Island informed the Marine Superintendent that they did not intend to make the necessary repairs and that the vessel would be placed in "wet storage" at Wickford Shipyard.

In September of 1971 the COMET was purchased by William Jackson of Cumberland, Rhode Island, apparently for use as a charter vessel, and plaintiffs allege that the boat was so used during the summer of 1972. On May 19, 1973, a group of people, which included the decedent, STEVEN GERCEY, chartered the COMET for a fishing trip. After being out of port for about forty-five minutes the vessel broke up and sank. Among those lost were STEVEN GERCEY and the boat's owner and captain, William Jackson. The cause of the disaster has not been established, although the plaintiffs allege that the weather and sea conditions were such that they did not contribute to the accident.

II

The plaintiffs purport to bring this action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, and allege jurisdiction under 28 U.S.C. § 1346(b). The defendant concedes that this Court has jurisdiction over this action but contends that the Federal Tort Claims Act is not applicable to this case, which, they argue, must be based on admiralty jurisdiction under 28 U.S.C. § 1333. Determination of the proper basis of jurisdiction in this case will determine whether Rhode Island or federal sub-

stantive law is to be applied.[1] Under the Federal Tort Claims Act, the applicable law is that of the state in which the act or omission complained of occurred, 28 U.S.C. § 2674; *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *United States v. Schultz,* 282 F.2d 628 (1st Cir.1960), cert. denied 365 U.S. 817, 81 S.Ct. 698, 5 L.Ed.2d 695. Suits in admiralty, on the other hand, are governed by federal substantive and procedural law, *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *St. Hilaire Moye v. Henderson,* 496 F.2d 973 (8th Cir.1974).

The Federal Tort Claims Act expressly excludes from its coverage any claim for which a remedy is provided by the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, or the Public Vessels Act, 46 U.S.C. §§ 781–790. 28 U.S.C. § 2680(d). The plaintiffs argue, however, that this does not mean that all maritime or admiralty courts are beyond the coverage of the Federal Tort Claims Act, since, they claim, these two admiralty statutes do not embrace all maritime torts. In particular they cite *Moran v. United States,* 102 F.Supp. 275, 277 (D.Conn. 1951), where the Court held that maritime torts of the employees of the United States, as distinguished from torts of vessels of the United States, were intended to be covered by the Federal Tort Claims Act.

In 1960, however, the Suits in Admiralty Act was amended, and as the Court of Appeals for the Ninth Circuit explained in *Roberts v. United States,* 498 F.2d 520, 525–526 (1974), the language added means that torts of government employees as well as government vessels are to be covered by the federal courts' admiralty jurisdiction:[2]

"The District Court, believing that the admiralty statutes extended only to claims involving United States vessels or cargo concluded that the appellees' maritime claim was maintainable solely under the FTCA. Prior to 1960, this interpretation of the intersecting scope of the statutes would have been correct. However, in 1960 Congress amended section 742 of the SIA by deleting the language which restricted the statute to claims involving merchant vessels and by substituting a broad new jurisdictional statement:
'In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, *or if a private person or property were involved*, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States. . . .' Pub.L. No. 86–770, sec. 3, 74 Stat. 912. (Emphasis added)

The addition of the phrase 'or if a private person . . . were involved' has been interpreted by a majority of courts as a legislative attempt to bring all maritime torts asserted against the United States within the purview of the SIA. See *De*

---

1. Although the choice between Rhode Island and federal law conceivably could make a difference if this case were to go to trial, it has little effect upon the resolution of the present motion. Even if Rhode Island law is applied, the plaintiffs concede that the duty they assert the defendants breached is based upon federal statutes which have never been the basis for a decision under Rhode Island law, *see* Section III, *infra,* and there is no Rhode Island case law on the subject of proximate cause.

2. 46 U.S.C. § 742 now reads in relevant part as follows, with the pertinent language added in 1960 underlined:
"In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, <u>or if a private person or property were involved</u>, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . . ."
That torts of government employees were to be covered by the Suits in Admiralty Act was also indicated by the elimination of the proviso originally appearing at the end of the first sentence:
"provided that such vessel is employed as a merchant vessel or is a tugboat operated by such corporation."

*Bardeleben Marine Corp. v. United States,* 451 F.2d 140 (5th Cir. 1971); *Richmond Marine Panama, S.A. v. United States,* 350 F.Supp. 1210, 1219–1220 (S.D.N.Y.1972); *Tankrederiet Gefion A/S v. United States,* 241 F.Supp. 83 (E.D.Mich.1964); Contra, *J. W. Petersen Coal & Oil Co. v. United States,* 323 F.Supp. 1198 (N.D.Ill.1970). Moreover, this expanded interpretation of the SIA appears to conform with retrospective Congressional understanding of the Act, as the court in *Richmond Marine Panama, S.A. v. United States, supra,* notes:

'Although subsequent Congressional explanation of the meaning of a statute is not binding on the courts, it is interesting to note, nevertheless, that a Senate Report of August 17, 1972 explained that the 1960 amendment extends jurisdiction under the Suits in Admiralty Act "to the full range of admiralty cases which might have been maintained had a private person or property been involved rather than the Government or its agents and employees or property." Senate Report No. 92–1079, 92d Cong., 2d Sess., 1972, 9 U.S.Code Cong. and Admin.News, pp. 4045, 4050.' *Id.* 350 F.Supp. at 1220, note."

█ It appears then that all the courts that have construed the 1960 amendment, with the exception of a district court in Illinois in *J. W. Petersen Coal & Oil Co. v. United States,* 323 F.Supp. 1198 (N.D.Ill.1970), upon which the plaintiffs heavily rely, have held that the maritime torts of government employees are now covered by the Suits in Admiralty Act. This Court is persuaded that the majority view on this question is the correct one, particularly in light of the fact that the *Petersen* decision was an interlocutory decision which the United States never appealed because the plaintiff Petersen's case was ultimately dismissed on the merits by the District Court. Defendant's Memorandum in Support of Motion at 2. Thus, the plaintiffs' claim in this case must be heard in admiralty, where it can be brought under 46 U.S.C. § 742, and cannot be heard under the Federal Tort Claims Act, since it is barred by the exception for claims in admiralty, 28 U.S.C. § 2680 (d).

## III

The plaintiffs contend that the substantive basis of the defendant's liability lies in the duty imposed upon the Coast Guard by statute to inspect passenger vessels and certify that they are seaworthy and safe. 46 U.S.C. §§ 390, 390a–390d instructs the Secretary of the Executive Department in which the Coast Guard is operating to cause each small passenger carrying vessel [3] to be inspected at least once every three years for seaworthiness and safety.[4] No such vessel may operate without a certificate of inspection,[5] and violators may be fined

---

3. "The term 'passenger-carrying vessel' means any vessel which carries more than six passengers, and which is (1) propelled in whole or in part by steam or by any form of mechanical or electrical power and is of fifteen gross tons or less; (2) propelled in whole or in part by steam or by any form of mechanical or electrical power and is of more than fifteen and less than one hundred gross tons and not more than sixty-five feet in length measured from end to end over the deck excluding sheer . . . .."

4. "The Secretary shall, at least once every three years, cause to be inspected each passenger-carrying vessel, and shall satisfy himself that every such vessel (1) is of a structure suitable for the service in which it is to

be employed; (2) is equipped with the proper appliances for lifesaving and fire protection in accordance with applicable laws, or rules and regulations prescribed by him; (3) has suitable accommodations for passengers and the crew; and (4) is in a condition to warrant the belief that it may be used, operated, and navigated with safety to life in the proposed service and that all applicable requirements of marine safety statutes and regulations thereunder are faithfully complied with." 46 U.S.C. § 390a(a).

5. "No passenger-carrying vessel shall be operated or navigated until a certificate of inspection in such form as may be prescribed by the regulations promulgated by the Secretary under the authority of this Act (sec.

up to $1,000 for each violation, for which sum the vessel may be seized.[6] The defendant concedes that these provisions were applicable to the COMET but contends that the Coast Guard was diligent in the matter of inspection and properly decertified the vessel when the occasion required.

The plaintiffs do not appear to contest the defendants on this point, but they contend that the defendant had a duty not only to inspect the vessels and to certify or decertify them but also a duty to enforce these provisions. The Coast Guard was negligent, they assert, in failing to have some rudimentary mechanism to protect the paying passenger public from unseaworthy vessels *after* their decertification. The statutes themselves, the plaintiffs argue, speak of some duty of ongoing enforcement to follow-up on the inspections of certified vessels and in particular to see that decertified vessels are not used to carry passengers, citing 46 U.S.C. § 435:

"435. Reinspections and notice for repairs; Enforcement of requirements In addition to the annual or biennial inspection, the head of the department in which the Coast Guard is operating shall require the Coast Guard to examine, at proper times, inspected vessels arriving and departing to and from their respective ports, so often as to enable them to detect any neglect to comply with the requirements of law, and also any defects or imperfections becoming apparent after the inspection aforesaid, and tending to render the navigation of such vessels unsafe; and if there shall be discovered any omission to comply with the law, or

that repairs have become necessary to make such vessel safe, the master shall at once be notified in writing as to what is required. All inspections and orders for repair shall be made promptly. When it can be done safely, repairs may be permitted to be made where those interested can most conveniently do them. And whenever it is ascertained that any vessel subject to the provisions of this title or Acts amendatory or supplementary thereto, has been or is being navigated or operated without complying with the terms of the vessel's certificate of inspection . . . the owner or master of said vessel shall be ordered to correct such unlawful conditions, and the vessel may be required to cease navigating at once and to submit to reinspection; and in case the said orders shall not at once be complied with, the vessel's certificate of inspection shall be revoked, and the owner, master, or agent of said vessel shall immediately be given notice, in writing, of such revocation; and no new certificate of inspection shall be again issued to her until the provisions of this title or Acts amendatory or supplementary thereto have been complied with. Any vessel subject to the provisions of this title or Acts amendatory or supplementary thereto operating or navigating or attempting to operate or navigate after the revocation of her certificate of inspection and before the issuance of a new certificate, shall, upon application by a department or agency charged with the enforcement of such title or Acts, to any district court of the United States having jurisdiction, and by proper order or action of said court in

---

390 and note–390g, 404, 526f of this title), has been issued to the vessel indicating that the vessel is in compliance with the provisions of this Act (sec. 390 and note–390g, 404, 526f of this title), and the rules and regulations established hereunder . . . ." 46 U.S.C. § 390c(a).

6. "Any owner, master, or person in charge of any vessel subject to [this Act] sections 390 [and note] –390g, 404, 526f of this title who violates the provisions of [this Act] [sec. 390

and note–390g, 404, 526f of this title], or the rules and regulations established hereunder, shall be liable to the United States in a penalty of not more than $1,000 for each such violation, for which sum the passenger-carrying vessel shall be liable and may be seized and proceeded against by way of libel in any district court of the United States having jurisdiction of the violation." 46 U.S.C. § 390d.

the premises, be seized summarily by way of libel and held without privilege of release by bail or bond until a proper certificate of inspection shall have been issued to said vessel . . ."[7]

The plaintiffs argue that the Coast Guard was negligent in carrying out this duty to enforce the inspection statutes cited above because after decertifying the COMET the Coast Guard took absolutely no follow-up measures to insure that the decertified vessel would not be illegally used to carry passengers. The sole action taken by the defendant, according to the plaintiffs, was to remove from the COMET a 4″ x 6″ piece of paper and file it in Washington, D.C. It took none of the actions that a reasonable man would have undertaken to protect the paying passenger public whose safety Congress entrusted to the Coast Guard.

Plaintiffs list a half dozen actions that could have been reasonably taken by the Coast Guard, any one of which could possibly have prevented the tragic loss of life that occurred on May 19, 1973, when the COMET sank. The Coast Guard could have 1) required the COMET's former owner or the marina owner to inform it of any change of ownership of the vessel; 2) informed the new purchaser of the condition of the vessel and inquired of him his purpose in acquiring the vessel; 3) informed either the general public or the specific passengers by way of a public notice or a sign of the condition of the vessel; 4) notified local Coast Guard units that the vessel had been decertified; 5) periodically revisited the vessel to see if it was in use or at least called the shipyard to check on its status; or 6) seized the vessel under the authority of 46 U.S.C. § 435.

There can be no doubt that several of these courses of action are eminently reasonable and perhaps might have played a role in preventing the events of May 19, 1973. It is noteworthy that one of the recommendations from the Marine Inquiry Board's preliminary report is that the Coast Guard develop some mechanism whereby it can maintain a comprehensive file by which it can keep track of decertified vessels. Plaintiffs Supplemental Memorandum at 14–15. It might even be that the Coast Guard was actually negligent in not developing and implementing a procedure for following-up on vessels it had decertified. But such a conclusion would not necessarily mean that the plaintiffs had stated a claim in this case for which relief can be granted.

The plaintiffs have stated a novel claim for which there is no precedent under the Coast Guard inspection statutes on which they rely, and if found to be implied by the statutes, such a cause of action could have wide-ranging ef-

---

**7.** The defendant argues that this provision does not apply to vessels of the COMET's classification. The reference in § 435 to "annual or biennial inspection", it contends, indicates that it is referring to the inspection requirements of 46 U.S.C. §§ 391(a), (b), neither of which defendant asserts, is applicable to small diesel vessels like the COMET. The annual hull inspection required by § 391(a), however, applies to "every steam vessel carrying passengers." Since § 361 defines a steam vessel for the purposes of these provisions as any vessel "propelled in whole or in part by steam or by any other form of mechanical or electrical power," it appears that § 391(a), and therefore § 435, applies to the COMET. On the other hand, it could be argued that § 367, which was passed after § 361, was intended to supersede it in part. Section 367 provides in part that "existing laws

covering the inspection of steam vessels are made applicable to seagoing vessels of [300] gross tons and over propelled in whole or in part by internal-combustion engines to such extent and upon such conditions that may be required by the regulations of the commandant of the Coast Guard . . . ." It could be argued, especially in light of an opinion of the Attorney General that § 361 was ambiguous and required clarifying legislation, 38 Op.Atty. Gen. 441 (1938), that § 367 was intended to limit the treatment of diesel powered vessels as steam vessels to those diesel powered vessels over 300 gross tons. Thus, the 15 ton COMET could not be covered by §§ 391(a) and 435. In any case, the question is academic since the defendant has conceded "whichever set of statutes is examined, the sanctions imposed are the same". Defendant's memorandum of law at 3.

fects on admiralty jurisdiction and on the principles of governmental liability in general. While I do not rule out the possibility that such a cause of action could be found to exist, I must note that I do not find the authority the plaintiffs have cited in support of their position to be particularly compelling.

■■ The essence of plaintiffs' argument is simply that a) defendant has a statutory duty to enforce the inspection statutes; b) defendants did not reasonably carry out this duty; c) therefore defendants are liable for injuries resulting from this breach of duty. It is a general principle of governmental tort liability that a governmental unit is not liable for failure to enact or enforce an ordinance. 57 Am.Jur.2d, Municipal, School, and State Tort Liability, § 114. While there may be exceptions to this proposition, plaintiffs have provided meager justification for invoking any such exception in this context. Even if the Coast Guard were under an absolute duty, as plaintiffs contend, to enforce affirmatively the inspection statutes, the Coast Guard's choice of means by which to carry out that duty would be a completely discretionary, policy-making decision, and governmental agencies are generally free from liability resulting from such decisions. *Cf.* Federal Tort Claims Act, 28 U.S.C. § 2680(a); *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

In an effort to overcome what I would characterize as a strong presumption against liability in the present context, the plaintiffs cite several cases which they contend support their allegations that the defendant had a statutory duty to warn the new purchaser, the passengers, or the public in general about the condition of the COMET, and that governmental agencies can be held liable for negligently carrying out a duty to inspect. Plaintiffs cite the case of *Indian Towing Co., Inc. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) in support of their claim of defendant's duty to warn. According to the Court of Appeals for this Circuit, however, the duty to warn in *Indian Towing* developed out of the principle "that the government must not mislead, and must not induce reliance upon a belief that it is providing something which, in fact, it is not providing." *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189, 195 (1st Cir. 1967). In the instant case, there is little support for the proposition that the new purchaser, the passengers, or the general public relied either on an expectation that they would be warned or on a belief that all passenger-carrying vessels in operation met Coast Guard safety requirements. Plaintiffs also cite a series of cases, including a recent Rhode Island decision, *Buszta v. Souther,* 102 R.I. 609, 232 A.2d 396 (1967) that hold inspectors liable to third parties injured as a result of negligent inspection despite the absence of privity of contract between the third party and the inspector. In the case at bar, however, there is no allegation that the Coast Guard's original inspection of the COMET was deficient, only that the defendant failed to follow through with subsequent enforcement of the decertification, a factor not present in the plaintiffs' negligent inspection cases.

Neither party, even after a request by the Court for additional memoranda, has briefed the question of liability for failure to enforce the inspection statutes with much imagination. There are several analogous areas that come to mind the exploration of which could perhaps have shed light on the present question, but neither side has offered any discussion of them. For example, is a state motor vehicle agency liable if a car that has failed to pass a state safety inspection illegally returns to the road and causes an accident in which third parties are injured? Is the Federal Aviation Administration liable if insufficient follow-up of its safety inspection allows an unsafe airplane to be illegally used by an airline and the plane subsequently crashes? Is a local building commissioner liable for injuries caused when an apartment building that has been repeatedly cited for violations of the fire

code but never ordered closed catches fire?

It is not necessary at this point, however, to explore fully these questions or reach a final determination of whether the plaintiffs have a cause of action against the United States for its failure reasonably to enforce the inspection statutes, for it is the conclusion of this Court that even if the Coast Guard breached such a duty to the plaintiffs, it would not be possible for the plaintiffs to establish that such breach was the proximate cause of their injuries.

## IV

The defendant has argued in its memoranda that even if the Coast Guard were negligent, the action of the boat owner in taking out passengers for hire in a vessel he knew or should have known was without Coast Guard certification was such an intervening act of negligence as to preclude liability of the United States. I do not agree. It is literally hornbook law that a defendant may be held liable in the presence of a major intervening cause if the intervention of the later cause is a significant part of the risk involved in the defendant's conduct. The defendant, therefore, is to be held liable if the intervening cause is "foreseeable". W. Prosser, Law of Torts, § 44 at 272 (4th Ed. 1971). The same is true even if the intervening cause is an intentional or criminal act if it is one the defendant might reasonably anticipate and against which it would be required to take precautions. Id. at 275. In the present case it is likely that the plaintiff would be able to prove at trial that the Coast Guard could have reasonably anticipated that if it inadequately enforced the inspection statute vessel owners like Mr. Jackson might illegally carry passengers on decertified vessels. In that event the intervening cause of Mr. Jackson's own negligence would not be sufficient to insulate the United States from liability.

In order to reach such a point, however, the plaintiffs would first have to prove that the Coast Guard's alleged negligence was a major causal link in the events culminating in the sinking of the COMET. For as Professor Prosser points out, the problem of intervening cause is not one of causation at all, since it does not arise until after causation has already been established. Id. at 270. It is the conclusion of this Court that the plaintiffs have failed to clear this initial hurdle. Based on the plaintiffs' pleadings, proposed findings of fact, and memoranda of law, and viewing all the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the plaintiffs, see Wright and Miller, Federal Practice and Procedure: Civil § 1368 at 690, I can find no showing that the alleged negligence on the part of the Coast Guard in enforcing the inspection statutes was the proximate cause of the plaintiffs' injuries. The plaintiffs have therefore failed to state a claim for which relief can be granted.

The notion of proximate cause is a confusing concept in tort law and one often utilized as a means of disguising policy judgments that have no connection with questions of causation at all. Prosser, supra, sec. 41 at 237. Nevertheless, while notions of proximate cause are sometimes used to limit liability even where causation in fact can be demonstrated, e. g., where there is an intervening cause sufficient to insulate a negligent party from liability, the converse is not true: barring the application of principles of strict liability, there can be no finding of proximate cause, and hence no liability, where the defendant's negligence was not a cause in fact of the plaintiff's injury.

A useful tool for analyzing questions of causation in fact is the "but for" or "sine qua non" rule:

> "The defendant's conduct is not a cause of the event, if the event would have occurred without it." Id. 239.

In the case at bar the plaintiffs have made no factual allegation that standing alone or operating through inference would support a conclusion that "but for" the Coast Guard's negligence, the

vessel COMET would not have sunk on May 19, 1973 and STEVEN GERCEY would not have lost his life.

Even assuming that the Coast Guard was negligent in carrying out its duties, there is no allegation that a reasonable and diligent enforcement effort by the Coast Guard, perhaps including some or even all of the measures proposed by the plaintiffs for keeping track of, and protecting the public from, decertified vessels would have prevented the tragic events of May 19. The only means of enforcement the Coast Guard could use that would effectively protect the public from decertified vessels in all cases would be a policy of seizing all such vessels immediately upon decertification. Not only would such a policy be unreasonable on its face, however, but it would probably far exceed the Coast Guard's power of seizure as provided in 46 U.S.C. § 435. While it is conceivable that less drastic enforcement efforts could have been adopted by the Coast Guard which might have in fact succeeded in preventing Mr. Jackson from using the COMET for fishing charters after it had been decertified, no such facts have been alleged in the pleadings or included in the plaintiffs' proposed findings of fact. Consequently, I conclude that the plaintiffs have not alleged that the Coast Guard's negligence was in fact a cause of the plaintiffs' injuries and that the plaintiffs have therefore failed to state a claim for which relief can be granted.

One point should be made in conclusion however. The loss of sixteen lives with the sinking of the COMET was a terrible and needless tragedy. The plaintiffs are denied relief in this case because they have not claimed that lack of care by the Coast Guard in enforcing the inspection statutes was an actual cause of this tragedy. But there can be no doubt that improved enforcement of these statutes might help avert similar accidents in the future. The record before me indicates that the Coast Guard has absolutely no standard procedure for keeping track of decertified vessels, and while this may not result in tort liability,

at least in this particular case, it is a shameful record nonetheless. This Court can only hope that the Coast Guard has learned from this experience and will devise and implement, as rapidly as possible, the procedures necessary to reduce the likelihood of this type of tragedy recurring.

Defendant's motion for judgment on the pleadings is hereby granted.